11 F.3d 1360
 Jerrell E. BARNHILL, Plaintiff-Counterclaim Defendant-Appellee,
v.
UNITED STATES of America, Defendant-Counterclaimant-Appellant,
v.
SECURITY PACIFIC BUSINESS CREDIT, INC., Counterclaim
Defendant-Appellee.
In the Matter of Douglas W. SNOEYENBOS and Stephen T. Lyons,
Petitioners,
v.
Hon. Robert L. MILLER, Jr., United States District Judge for
the Northern District of Indiana, Jerrell E.
Barnhill, Security Pacific Business
Credit, Inc., and United
States of America,
Respondents.
 Nos. 92-3556, 93-1683.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 23, 1993.*
Decided Dec. 10, 1993.
Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 28, 1994.
 
 Edward L. Volk (argued), John F. Lake, Newby, Lewis, Kaminski & Jones, LaPorte, IN, for Jerrell E. Barnhill.
 Michael L. Paup (argued), Gary R. Allen, John A. Dudeck, Jr., Dept. of Justice, Tax Div., Appellate Section, Washington, DC, Clifford D. Johnson, Asst. U.S. Atty., South Bend, IN, for U.S.
 George E. Herendeen, Allen, Fedder, Herendeen & Kowals, South Bend, IN, for Security Pacific Business Credit, Inc.
 Douglas W. Snoeyenbos, pro se.
 Stephen T. Lyons, pro se.
 Before FLAUM and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 FLAUM, Circuit Judge.
 
 
 1
 Today we examine a tax case gone awry. On the third day of jury trial in this suit between Jerrell Barnhill, Security Pacific Business Credit, Inc. (Security), and the United States (Government), Barnhill and Security made a motion for judgment in their favor on all claims based on alleged misconduct by the Government's trial lawyers. Finding a "remarkable lack of candor" on the Government lawyers' part, the district court granted the motion and entered judgment against the Government. The Government now brings direct appeal. The Government trial attorneys (hereinafter "Petitioners") implicated by the district court separately seek relief and have petitioned this court, pro se, for a writ of mandamus vacating the district court's determinations regarding their conduct. Pursuant to a May 3, 1993, order of this court, we consider these matters together after having heard argument on the direct appeal. We now reverse the district court's judgment for Barnhill and Security and remand No. 92-3556. We deny the petition for mandamus sought in No. 93-1683.
 
 I.
 
 2
 This case began familiarly enough as a taxpayer suit to recover partial payment of a penalty assessed pursuant to Sec. 6672 of the Internal Revenue Code. When Josam Manufacturing Co. (Josam) failed to pay fully withholding taxes due for the second and third quarters of 1985, the Internal Revenue Service (IRS) assessed a 100% penalty against Barnhill, Josam's Vice President of Finance, as a responsible person of Josam who willfully failed to pay over the taxes. After Barnhill made partial payment and filed suit in United States District Court, the Government counterclaimed against him for the unpaid balance of the assessment--about $800,000--plus interest. The Government also filed a counterclaim against Security, Josam's lender, to recover a portion of the unpaid taxes pursuant to I.R.C. Sec. 3505.
 
 
 3
 Trial began on the morning of Monday, April 6, 1992, before Judge Miller in the South Bend Division of the Northern District of Indiana. However, the chain of events precipitating Judge Miller's decision to grant judgment in favor of Barnhill and Security stretches back to the previous week. Edward Volk, Barnhill's counsel, had sent a subpoena by certified mail to Mark Nolen, an IRS appeals officer from Indianapolis who had had prior dealings with Josam (on matters not at issue in this case). The subpoena directed Nolen to appear at trial in South Bend at 9 a.m. on Monday, April 6. Some time after receiving the subpoena, Nolen called Volk's office to ascertain why he was being summoned. Volk returned Nolen's call, explained that the matter related to Josam, and told Nolen that he was needed to authenticate certain documents that had been authored or received by him. Volk also advised Nolen that he need not appear until Tuesday at 9 a.m.
 
 
 4
 On Friday, April 3, one of the Government's trial counsel, Douglas Snoeyenbos, telephoned Volk to discuss the subpoena of Nolen. Precisely what was said in this conversation is the subject of some disagreement. Snoeyenbos maintains that he told Volk that Nolen's testimony would be irrelevant and for that reason the Government would likely file a motion to quash the subpoena. Volk asserts that Snoeyenbos also asked him how Nolen had been served and fell silent for several seconds once told that service was effected by certified mail. Snoeyenbos denies that he and Volk ever discussed the method of service or whether it was defective and recounts that they only spoke about the relevance of Nolen's testimony.[1] In any event, following his conversation with Volk, Snoeyenbos called Nolen at home and indicated that he did not yet know if Nolen would need or be allowed to testify and told Nolen that he would let Nolen know on Monday if he should appear at trial on Tuesday morning.
 
 
 5
 On Monday afternoon, following adjournment of the first day of trial, Snoeyenbos and Lyons returned to their hotel in South Bend and discovered unexpectedly that Nolen had checked into the room adjacent to Snoeyenbos'. That evening the three dined together. Snoeyenbos and Lyons indicated that they would not discuss the case with Nolen, but they did instruct him that he should not appear to testify the next morning because service was defective. On Tuesday morning Nolen left South Bend without speaking to Petitioners and returned to Indianapolis.
 
 
 6
 Meanwhile, Volk and counsel for Security, George Herendeen, decided to attempt to effectuate personal service on Nolen. Herendeen arranged for a process server to serve Nolen with a subpoena at his home in Indianapolis on Monday evening. When the server arrived at Nolen's house that night, he was told, apparently by Nolen's son, that Nolen was staying at a hotel in South Bend until the following day. By the next morning, this information had been relayed to Herendeen and Volk.
 
 
 7
 On Tuesday morning, Herendeen telephoned the IRS office in Indianapolis to inquire as to Nolen's whereabouts.[2] Told that Nolen was in South Bend, Herendeen left a message that Nolen should call him lest a U.S. Marshal be sent to insure his presence at trial. When he arrived at his office Tuesday afternoon, Nolen received the message. Concerned, he called the U.S. Attorney's office in South Bend to clarify what he should do. Somewhat later, Snoeyenbos received a written message in court that Nolen had phoned and was concerned that he may be required to appear.[3]
 
 
 8
 At 3:53 p.m. Volk called Nolen to testify (despite knowing that Nolen had not appeared that morning at the court). After it became clear to all that Nolen was not present, a sidebar conference was held. Volk informed the court about the subpoena and the previous week's conversations with Nolen and Snoeyenbos. Volk said that Snoeyenbos had told him that he (Snoeyenbos) would instruct Nolen not to appear and that he would file some sort of motion in that vein. Herendeen then asked Snoeyenbos if he knew where Nolen was. Snoeyenbos said that he did not know, and Lyons shrugged.
 
 
 9
 After the jury was excused for the day, the court resumed discussion of the matter. Judge Miller opened by asking Snoeyenbos to "[t]ell me what you know." Snoeyenbos began by recounting his version of the Friday conversation with Volk. This exchange followed:
 
 
 10
 The Court: What do you know about Mr. Nolen's failure to appear? Did you have a conversation with him?Snoeyenbos: It is my understanding, Judge, that Mr. Nolen received in the mail a subpoena. It is further my understanding that under Rule 45 such subpoenas must be delivered in person.
 
 
 11
 The Court: Let me go back to my question. Did you advise him that he needn't appear?
 
 
 12
 Snoeyenbos: Yes, I did, Judge.
 
 
 13
 Judge Miller then turned to Herendeen for his comments. Herendeen told of his attempt to serve process personally on Nolen the previous evening, acknowledging that he was informed that Nolen was staying in South Bend until Tuesday, and he related his conversation earlier that day with Nolen's office. Herendeen also stated that he thought "effectively the government is hiding a witness."
 
 
 14
 Volk spoke next, devoting the bulk of his comments to a defense of the propriety of his communication with Nolen (which Snoeyenbos had questioned). He concluded, however, by saying: "I would like the court to inquire to find out whether the representatives of the United States government in this courtroom today know that Mr. Nolen is here in South Bend, and if they know where he is, where he is staying, and if either of them have had any contact with Mr. Nolen since 9:00 o'clock Monday morning when the original subpoena was set for." This colloquy then took place:
 
 
 15
 The Court: Thank you, Mr. Volk. Mr. Snoeyenbos, back to you.
 
 
 16
 Snoeyenbos: Well, Judge, if you have any questions I would be happy to answer them.
 
 
 17
 The Court: Do you know where he is?
 
 
 18
 Snoeyenbos: No, sir, I do not.
 
 
 19
 The Court: You looked at the clock before you answered. Do you know where he was this afternoon?
 
 
 20
 Snoeyenbos: No, I do not. I can guess.
 
 
 21
 The Court: Well, I'm going to make what at this point will be a strong suggestion, and if all works out perhaps we will have it. It will be the last discussion about it.
 
 
 22
 I'm going to strongly suggest that the government have Mr. Nolen here tomorrow morning at 9:30.... It may well be that the testimony is cumulative at this point. That is a decision which I have been unable to make because something has happened to Mr. Nolen. The record before me strongly suggests that he may be reachable in South Bend if the right person inquires, that he--Well, I'm going to leave it at that.
 
 
 23
 I strongly suggest that the government have Mr. Nolen here tomorrow morning in response to the subpoena. If that doesn't develop, I guess we will have to move on from there....
 
 
 24
 Contacted that night by Petitioners, Nolen did appear at trial the next morning at 9:30. Outside the jury's presence, he testified as to his conversations with Volk and Snoeyenbos and the circumstances surrounding his trips to and from South Bend on Monday and Tuesday. Following Nolen's testimony,[4] Volk moved for judgment on the grounds of Government "tampering with the witness, the obstruction of the evidence, the continual violation of this court's scheduling order and the filing of the motions in limine" and "refus[al] to discuss settlement." Herendeen joined in the motion.
 
 
 25
 After a recess, the court first invited comment about the adequacy of service on Nolen. Volk and Herendeen argued that Rule 45 was at least complied with in spirit. Snoeyenbos was then given a chance to respond. He asserted that Rule 45 requires personal service of trial subpoenas, and told the court that he did not file a motion to quash because this was not a properly served subpoena. Snoeyenbos went on to contest the court's earlier assertion that he had demonstrated a lack of candor before the court in his responses of the previous day, explaining the circumstances as he perceived them and arguing that he truthfully answered the court's questions as to Nolen's whereabouts. Snoeyenbos stated that on Tuesday he was unsure of Nolen's travel plans on Tuesday, thinking at the time that Nolen may have decided to remain in South Bend to visit relatives. The discussion continued:
 
 
 26
 Snoeyenbos: So, on Monday, Judge, we told Mr. Volk that certified mail service was no good on Mr. Nolen.
 
 
 27
 The Court: Did you tell him Nolen was in town?
 
 
 28
 Snoeyenbos: No. I didn't know that was--
 
 
 29
 The Court: Did you tell him Tuesday that he had come to town Monday?
 
 
 30
 Snoeyenbos: No, sir.
 
 
 31
 The Court: So, I was not the only one who didn't know that Nolen wasn't here on Monday night, and at least sometime early Tuesday morning. As far as you know, nobody else knew other than you folks.
 
 
 32
 Snoeyenbos: The issue didn't come up until 4:00 o'clock when Mr. Volk wanted to call him as a witness.
 
 
 33
 After Herendeen and Volk were heard again and Volk conveyed his version of the Friday conversation with Snoeyenbos, Judge Miller offered Snoeyenbos an opportunity to respond to Volk's portrayal of that conversation:
 
 
 34
 Snoeyenbos: Judge, I am at your disposal. If you have any specific questions I would be more than happy to answer them, but I just don't--this is such a complex presentation I just don't know where to begin. So, if you have any questions--
 
 
 35
 The Court: I'm not asking any specific questions. If you wish to respond without the specific questions, you may.
 
 
 36
 Snoeyenbos: I do not, your Honor.
 
 
 37
 After a recess, Judge Miller orally granted the motion and ordered that judgment be entered for Barnhill and Security. Later that day, the court issued a written opinion explaining its decision. Of the five grounds upon which Barnhill and Security rested their motion, Judge Miller found that three were wholly without merit. He wrote that the Government was no more at fault for untimely filings and trial delay than were Barnhill and Security. Judge Miller also rejected the contention that a party's refusal to engage in settlement negotiations could be a basis for entering judgment against it.
 
 
 38
 However, Judge Miller did decide that Petitioners' conduct with respect to Nolen warranted granting judgment in the taxpayers' favor. He began by noting that mistrial would be an inadequate remedy for Barnhill as it would cause further delay in final disposition of the suit during which time interest on the assessments would continue to grow. Judge Miller also observed that the conduct in question surrounded a witness "whose contribution to the case may or may not be great, and who finally appeared to testify." However, he continued, the conduct "goes beyond the materiality of the evidence.... It goes to the integrity of the civil justice system."
 
 
 39
 Judge Miller cited Rule 3.4(a) of the Indiana Rules of Professional Conduct (to which litigants in the Northern District of Indiana are subject) which provides that a lawyer shall not "unlawfully obstruct another party's access to evidence [or] counsel or assist another person to do any such act." He concluded, however, that if the motion relied solely on this provision it would not be granted because service on Nolen was in fact defective. Nonetheless, Judge Miller wrote, "technical imperfection of the attempted service would not ... have mattered but for the intervention of the government's counsel." Instead of informing opposing counsel that Nolen was in town or filing a motion to quash, which would have allowed Barnhill and Security opportunity to achieve personal service, the government "granted itself a motion to quash by sending Mr. Nolen home." Judge Miller added, "[t]he combination of events--a combination of which only the government was aware--prevented the government's adversaries from achieving personal service on Mr. Nolen."
 
 
 40
 Judge Miller then turned to what he labeled "the government's remarkable lack of candor." He noted that it took three queries from the court before Snoeyenbos stated that he had instructed Nolen not to appear. Further, until Wednesday morning when Nolen testified, the Government did not mention to the court that Nolen had been in South Bend, spent Monday evening with the Petitioners, and intended to leave some time on Tuesday.[5] Judge Miller concluded:
 
 
 41
 In sum, the government knew, based on the Friday conversation between Mr. Volk and Mr. Snoeyenbos, that an issue existed concerning whether Mr. Nolen should be required to attend. The government informed Mr. Volk that it would file a motion to quash, which would place the issue before the court. Despite this, the government sent the witness home without notice to the court or to the attorney that intended to call the witness, and eventually represented to the court that it did not know such an issue existed until 4:00 on Tuesday. Knowing that neither the court nor opposing counsel knew the essential facts surrounding Mr. Nolen's failure to appear, the government counsel declined to offer that information, offering instead to answer any questions the court might devise in its ignorance of the facts.
 
 
 42
 The system of justice requires a higher plane of conduct. If the government engaged in such conduct in a criminal case--privately counseling a defense witness not to appear at trial and then failing to disclose its actions to the court or opposing counsel until opposing counsel coaxes the court to ask a direct question--dismissal certainly would be appropriate. This court cannot conceive of a principled bases for holding that less is expected of counsel in civil cases.
 
 
 43
 After the district court entered judgment, the Government filed a motion to alter or amend the judgment which, on August 11, 1992, the district court denied. The Government and Petitioners separately appealed to this Court. Petitioners' appeal was dismissed by order of this Court dated February 23, 1993. Petitioners then filed an "Original Petition for Writ of Mandamus Vacating Procedurally Defective Determinations in the District Court's Orders of April 8 and August 11, 1992." Pursuant to a May 3, 1993 order of this Court, we now consider the Government's appeal, No. 92-3556, and Petitioners' mandamus petition, No. 93-1683. For the reasons set out below, we reverse the judgment of the district court, remand No. 92-3556, and deny the petition for mandamus.
 
 II.
 A.
 
 44
 Before turning to the request for mandamus, we will consider the merits of the direct appeal.[6] The Government asks us to reverse the judgment that the district court entered against it as a sanction for the conduct of Government counsel. The Government argues that, however Petitioners' conduct is construed, judgment is too severe a sanction where, as here, the opposing party suffered no prejudice. The Government also argues that the district court erred in failing to consider lesser sanctions, in not giving the Government and its counsel opportunity to respond to the accusations against them, and in concluding that counsel acted improperly by instructing Nolen not to appear. The Government further asserts that misconduct of counsel unknown to the "client"--in this case the United States "as an institution"--does not warrant the sanction of judgment against the client. Finally, the Government and Petitioners go to some length to explain that the district court misinterpreted what was, they insist, innocent and good faith conduct.
 
 
 45
 Prior to examination of these contentions, we pause to clarify our role in reviewing a district court's determination of attorney misconduct and its imposition of the sanction of judgment. Preliminarily, we note that it is now clear that a federal court has the inherent power to sanction for conduct which abuses the judicial process. See Chambers v. NASCO, Inc., 501 U.S. 32, ---- - ---, 111 S.Ct. 2123, 2132-33, 115 L.Ed.2d 27 (1991). This power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Link v. Wabash R. Co., 370 U.S. 626, 630-31, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962). Moreover, pursuant to this power, a court may impose the severe sanction of dismissal with prejudice (or its equivalent, judgment) if the circumstances so warrant. See Roadway Express, Inc. v. Piper, 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980); Schilling v. Walworth County Park & Planning Comm'n, 805 F.2d 272, 274-75 (7th Cir.1986).
 
 
 46
 Generally, a district court's choice of sanction is reviewed for an abuse of discretion.[7] See English v. Cowell, 969 F.2d 465, 472 (7th Cir.1992). However, we have observed that the particular sanction of dismissal with prejudice or judgment is "draconian," Marrocco v. General Motors Corp., 966 F.2d 220, 223 (7th Cir.1992), and "must be infrequently resorted to by district courts," Schilling, 805 F.2d at 275.
 
 
 47
 In the normal course of events, justice is dispensed by the hearing of cases on their merits; only when the interests of justice are best served by dismissal can this harsh sanction be consonant with the role of courts. We have previously indicated the limited appropriateness of the sanction of dismissal: "A dismissal with prejudice is a harsh sanction which should usually be employed only in extreme situations, when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailing." Webber v. Eye Corp., 721 F.2d 1067, 1069 (7th Cir.1983).... Absent those circumstances, the careful exercise of judicial discretion requires that a district court consider less severe sanctions and explain, where not obvious, their inadequacy for promoting the interests of justice.
 
 
 48
 Id. In sum, although a district court has the discretion to fashion an appropriate sanction for misconduct that occurs before it, in selecting the powerful option of terminating the underlying action in favor of one party, the court must be guided by a certain measure of restraint. See also Halaco Engineering, 843 F.2d at 380 ("In cases where the drastic sanctions of dismissal or default are ordered, the range of discretion for a district court is narrowed....").[8] Thus, when contemplating the extreme sanction of judgment or dismissal under its inherent powers, it is appropriate for a district court to consider the egregiousness of the conduct in question in relation to all aspects of the judicial process.
 
 
 49
 We continue to eschew grafting a requirement of prejudice onto a district court's ability to dismiss or enter judgment as a sanction under its inherent power. See Daniels v. Brennan, 887 F.2d 783, 788 (7th Cir.1989). In general, however, dismissal or judgment is such a serious sanction that it should not be invoked without first considering what effect--if any--the challenged conduct has had on the course of the litigation. Undoubtedly, there are situations in which we will defer to the district court's decision to dismiss or enter judgment even in the absence of substantial adverse impact on the course of the proceedings. Misconduct may exhibit such flagrant contempt for the court and its processes that to allow the offending party[9] to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court. Cf. Pyramid Energy, Ltd. v. Heyl & Patterson, Inc., 869 F.2d 1058, 1062 (7th Cir.1989) (noting in affirming a Rule 41(b) dismissal that "[a] trial court is entitled to say, under proper circumstances, that enough is enough ..."). Similarly, there are species of misconduct that place too high a burden on limited judicial resources for a court to allow a case to continue. See generally Shea v. Donohoe Const'n Co., 795 F.2d 1071, 1074-78 (D.C.Cir.1986).
 
 
 50
 In assessing the appropriateness of the district court's choice of sanction in this case, we feel constrained to proceed under the assumption that Barnhill and Security incurred no real inconvenience as a result of Petitioners' deeds. The district court rather explicitly acknowledged that in electing to enter judgment against the Government, it was not engaging in an assessment of the harm suffered by Barnhill or Security as a result of Government counsel's conduct. What counsel did, the court wrote, "goes to the integrity of the civil justice system." Effectively, the district court regarded Petitioners' actions to be of a particularly egregious strain, a strain comprised of such actions so presumptively antithetical to proper use of the judicial process that a party should automatically forfeit its claims and defenses before the court. Prejudice clearly was not a factor in the district court's decision.
 
 
 51
 Also, we conclude from our review of the record that Barnhill and Security in fact suffered no real prejudice from Government counsel's actions with respect to Nolen. Nolen was called to testify at about 4 p.m. Tuesday afternoon, about one half hour before the court intended to adjourn for the day. When he did not appear, the rest of the trial day was devoted to another witness whom Volk had planned to call. Afterwards, having been strongly admonished by the court, Petitioners made sure that Nolen was available to testify the next morning. While Barnhill and Security allege generally that they sustained prejudice to their "due process rights and their right to a jury trial," it has not been shown and we fail to see how an insignificant delay in Nolen's appearance deprived them of any such rights or impaired their ability to present their cases. Moreover, from all indications, Nolen was a witness of marginal or no direct relevance to the merits of the dispute and whose absence would not have prevented the introduction of any relevant evidence.[10] We, therefore, proceed as the district court did and confine our examination to the conduct in question.
 
 
 52
 This case is unusual as it does not present discrete examples of obviously wrongful behavior that typically characterize decisions to sanction with dismissal. First, the district court was explicit in its belief that Petitioners were not attempting to hide Nolen from service, and there is absolutely no basis in the record to dispute that conclusion (and, on this appeal, Barnhill and Security do not). Second, the district court did not find or even imply that Petitioners were untruthful in any of their responses to questions from the bench.[11] Instead, the court found that Government counsel displayed a "remarkable lack of candor" when on Tuesday they did not immediately disclose that they had instructed Nolen not to appear and did not reveal to the court or opposing counsel that they had seen Nolen in South Bend the previous evening. Finally, as we read Judge Miller's opinion, there is no finding that counsel directly contravened the ethical rules of the court by "unlawfully obstruct[ing] ... access to evidence." Because service on Nolen was in fact defective, Barnhill and Security were not entitled to Nolen's presence at trial and thus the court could not find unlawful interference with evidence. Rather, the court concentrated on Government counsel's exploitation of what was in fact a technical imperfection in service to stonewall its opponent's trial efforts, compounded in the court's mind by failure to bring the issue before the court by a motion to quash service.[12]
 
 
 53
 Although the district court was justifiably frustrated by Petitioners' stratagems with respect to a peripheral witness and their reluctance to be forthright about the affair when questioned by the court, under the circumstances of this case Petitioners conduct did not warrant the extreme sanction of dismissal. We do not arrive at this conclusion by second-guessing the district court's conclusions as to the nature of the conduct it observed. The Government and Petitioners have reconstructed the events of the few days in question and argue strongly that there was no deliberate attempt to withhold information or connivance to keep the court in the dark. Rather, the whole incident can be plausibly explained, they submit, as a series of misunderstandings.
 
 
 54
 From an appellate perch, it is exceedingly difficult to ascertain from an examination of transcripts the precise motivations behind particular responses to particular questions. We look backwards at these events removed from the physical setting and the atmosphere of the arguments and the trial as a whole. Furthermore, inflections, pauses, hesitations and interruptions cannot meaningfully be discerned from the typewritten words. Therefore, for example, it is virtually impossible for us to ascertain the level of candor Snoeyenbos displayed by not acknowledging until prompted a third time by the court that he advised Nolen not to appear. Petitioners and the Government demonstrate that Snoeyenbos' responses to the court reasonably may be interpreted to represent a good faith attempt to address the court's concerns as Snoeyenbos understood them and to explicate the situation in its entirety. They explain that although Snoeyenbos' answer to the court's second query ("What do you know about Mr. Nolen's failure to appear? Did you have a conversation with him?") was not directly responsive ("It is ... my understanding that under Rule 45...."), it represented Snoeyenbos' attempt to state why he did what he did before proceeding to list exactly what he did do. And the Government and Petitioners point out that when the court clarified that it was not interested in the whole story, Snoeyenbos immediately acknowledged the fact that he instructed Nolen not to appear.
 
 
 55
 Admittedly, the Government's and Petitioners' reconstructions of this and other critical colloquies in the case have plausible rings. Perhaps the district court's assessment of Petitioners' candor would have been difficult to endorse had it rested on this incident in isolation. But obviously it did not; and we do not disagree that failing to apprise the court about seeing and meeting with an out-of-town witness whose whereabouts is of clear concern to the court, and instead offering to entertain the court's questions, constitutes something short of complete openness. Hence, we cannot conclude that Judge Miller's determination about Petitioners' lack of candor was clearly erroneous. In a similar vein, the trial tactics employed in this case can hardly be held up as a model of cooperative litigation. While we agree with the Government that Rule 45 does not obligate one to contest defective service by filing a motion to quash, see 5A J. Moore & J. Lucas, Moore's Federal Practice, p 45.11 (1992), time and aggravation could have been saved by presenting the dispute to the court. Judge Miller was straining to accommodate this five day jury trial in a busy court schedule and understandably did not appreciate the fact that the Petitioners saw fit to bog down progress on collateral matters.
 
 
 56
 Nonetheless, if no meaningful impact upon the course of the litigation has been shown, as is this case here, the drastic sanction of dismissal or judgment should be reserved for conduct that evinces a more intense disregard for the court. We understand that Judge Miller did not base his conclusions about Petitioners' level of candor on any one incident and decided to enter judgment because of Petitioners' overall behavior in this litigation. But even taken together and construed in the worst possible light, Petitioners' conduct does not amount to the kind of frontal assault on the integrity of the judicial system that would support such an extreme sanction. Certainly, Petitioners were to an improvident extent caught up in "hardball" litigation tactics. They also foolishly incurred the court's ire through their reticence, which they unwisely maintained even when the court allowed them opportunities to defend and explain their actions. Nevertheless, we believe that in the absence of prejudicial effect, adverse judgment was too severe a form of discipline for conduct which, while distressingly uncooperative, involved no clear violation of procedural or ethical rules. We, therefore, reverse the judgment of the district court and remand this case for trial.
 
 B.
 
 57
 Petitioners separately have asked us to issue a writ of mandamus "vacating the procedurally defective determinations" of the district court, claiming that the district court's findings will cause future harm to their professional reputations. They assert that several grounds entitle them to this extraordinary relief. First, Petitioners contend that the district court exceeded the bounds of its discretion simply by entertaining the motion for judgment when Security and Barnhill clearly suffered no prejudice as a result of Petitioners' conduct. The lack of prejudice, they argue, deprived Security and Barnhill of standing to move for judgment and also activated the harmless error mandate of Rule 61 which the district court was required to heed. Second, characterizing the district court's action as disciplinary, not remedial, in purpose, Petitioners protest the court's failure to follow the procedure of its own disciplinary rules in adjudicating allegations of misconduct. Finally, Petitioners argue that even if the local disciplinary rules are not applicable to this case, the procedure Judge Miller did follow did not provide them with sufficient notice and opportunity to be heard before a determination and public pronouncement of their misconduct was made.
 
 
 58
 We do not reach the merits of these contentions, however, because Petitioners have not shown that they have suffered a cognizable injury as a result of Judge Miller's opinion. In Clark Equipment Co. v. Lift Parts Manufacturing Co., 972 F.2d 817 (7th Cir.1992), this court refused an attorney's request to vacate a district court opinion finding that the attorney had violated Federal Rule of Civil Procedure 11, 26 and 37 and was in contempt of court. We observed that the attorney made "only general allegations that he may suffer harm in the future ... represent[ing] no more than a 'speculative contingency,' insufficiently 'real and immediate to show an existing controversy.' " Id. at 820 (quoting Deakins v. Monaghan, 484 U.S. 193, 200-01 n. 4, 108 S.Ct. 523, 528-29 n. 4, 98 L.Ed.2d 529 (1988)). We added that mandamus may eventually be available someday when the attorney could "show concrete harm to his reputation from the bare existence of [the] opinions." Id. In this case, Petitioners have similarly not alleged anything more than speculative harm to their professional reputations.
 
 
 59
 We will not conjecture about rare cases in which sufficient harm may arise from the severity of a vitriolic opinion itself because we do not read Judge Miller's opinion to be, in substance or tone, of an inherently injurious nature. It is true that Judge Miller deemed Petitioners' conduct sufficiently troubling to warrant judgment for the taxpayers, but because today we do find that decision disproportionately severe, it hardly remains a solid basis for arguing aggravation of any harmful effects of Judge Miller's findings. Consequently, we deny Petitioners' mandamus request to vacate the district court's determinations regarding their conduct.
 
 III.
 
 60
 Despite our disagreement with Judge Miller's choice of sanction, we too are dismayed by the behavior of representatives of the United States. District judges rightfully expect that Justice Department lawyers would be the last attorneys from whom they would need to cajole and pry out information relevant to matters of obvious concern. So too, as the inscription on the Attorney General's Rotunda reads, "[t]he United States wins its point whenever justice is done its citizens in the courts," not when witnesses are sent home because of technical deficiencies in service. We reverse the case on the merits here because Petitioners' conduct, while hardly exemplary, was not contumacious. Nonetheless, we strongly suggest that Government attorneys demonstrate considerably more circumspection in the future.
 
 
 61
 REVERSED AND REMANDED. PETITION DENIED.
 
 
 
 *
 Appeal No. 93-1683 was submitted for decision without argument
 
 
 [1]
 Snoeyenbos and Stephen Lyons, the other Government trial counsel, state that on Monday morning prior to opening arguments Lyons did tell Volk that mail service was improper and Nolen would therefore be instructed not to appear. Volk denies being so informed
 
 
 [2]
 Nolen, who on return from South Bend had gone home before proceeding to his office, was not yet in
 
 
 [3]
 By implication, the note indicates that Nolen called from his office in Indianapolis. (The note lists Nolen's work number as the return number and suggests that the government employee who took the message called Nolen back at that number in ultimately speaking with him.) Snoeyenbos attests that in the heat of trial he did not draw any conclusions from the note as to Nolen's whereabouts
 
 
 [4]
 At this point, the court granted the Government's oral motion in limine to prevent the jury from hearing testimony from Nolen about why he did not appear on Tuesday. In so ruling, Judge Miller stated that he was "comfortable that the government was not concealing Mr. Nolen from service of process on Monday night when service was attempted by Mr. Herendeen through the process server," but noted that he was "troubled by an enormous lack of candor in this courtroom yesterday concerning the whereabouts of Mr. Nolen and people's knowledge of it."
 
 
 [5]
 Judge Miller also chastised Petitioners for launching a "groundless attack on Mr. Volk's conduct on ethical grounds" by questioning the propriety of his communications with Nolen. He commented too that this incident illustrated an additional example of problems with Petitioners' candor. Earlier in the trial Petitioners opposed admission into evidence of an IRS agent's statement, arguing that the IRS was not a party-opponent to Barnhill. Yet, Judge Miller observed, Petitioners later claimed to be representing "the United States" and suggested that in speaking with the IRS Volk had engaged in improper communication with their client
 
 
 [6]
 We may along the way, however, address arguments raised by petitioners in their request for mandamus when we feel it would be advisable to do so in the interest of orderliness
 
 
 [7]
 A district court's finding of facts underlying a decision to impose sanctions will not be upset unless clearly erroneous. Ordower v. Feldman, 826 F.2d 1569, 1574 (7th Cir.1987); Halaco Engineering Co. v. Costle, 843 F.2d 376, 379 (9th Cir.1988)
 
 
 [8]
 The Government and Petitioners argue that the decision of the Supreme Court in Bank of Nova Scotia v. United States, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), now places a more explicit limit on a district court's discretion to sanction by dismissal. Specifically, they contend that the rationale of Bank of Nova Scotia indicates that judgment cannot be an appropriate sanction for misconduct that does not prejudice the opposing parties. In Bank of Nova Scotia, the Court held that a federal court may not invoke its "supervisory power" to dismiss an indictment for prosecutorial misconduct where the misconduct did not prejudice the defendant. The Court observed that by doing so a federal court would "circumvent the harmless-error inquiry prescribed by the Federal Rule of Criminal Procedure 52(a) [which] provides that '[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.' " Id. at 254-55, 108 S.Ct. at 2373. Because the enabling legislation for the Rules of Criminal Procedure mandated that the Rules supersede all conflicting laws, the Court concluded that the scope of a court's supervisory powers must be limited accordingly. See id. at 255, 108 S.Ct. at 2373
 The Federal Rules of Civil Procedure also contain a harmless error provision, which, the Government and Petitioners maintain, serves as an analogous restriction on a federal court's power to use dismissal or judgment as a sanction in the civil context. First, Rule 61 provides that "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Second, the Rules of Civil Procedure, like the Rules of Criminal Procedure, trump contrary law. See 28 U.S.C. Sec. 2072. Hence, concludes the syllogism, so long as another Rule authorizing dismissal in the absence of prejudice is not applicable, see, e.g., Rule 37 (failure to comply with discovery order); Rule 41(b) (involuntary dismissal for "failure of plaintiff to prosecute or to comply with these rules or any order of court"), a district court exceeds its authority when it enters judgment against a party for attorney misconduct if the opposing side has suffered no prejudice as a result.
 In view of our disposition of the case, we choose not to take this opportunity to pause and fully consider the applicability of the rule of Bank of Nova Scotia in the civil context where its appropriateness is likely reduced. Interpreting Rule 61 to impose a prerequisite of prejudice to a court's inherent power to enter judgment against a party for misconduct in civil litigation would introduce an odd imbalance in the arsenal of sanctions available to a district judge. Without a showing of prejudice, Rule 41(b) & (c) subjects plaintiffs (and counterclaimants and the like) to dismissal for failure to comply with an order of the court. See Daniels v. Brennan, 887 F.2d 783, 788-89 (7th Cir.1989). If Rule 61 were to limit the court's inherent power as suggested, a defendant would not face corresponding discipline. While for constitutional reasons such asymmetry is inherent in the criminal process, we are not anxious to import it into the civil arena. Furthermore, because the civil harmless error provision is narrower than its criminal counterpart (only mandating disregard of "error or defect" and not "irregularity or variance" as well), in this context there is all the more reason "not [to] lightly assume that Congress has intended to depart from established principles such as the scope of a court's inherent power." Chambers, 501 U.S. at ----, 111 S.Ct. at 2134 (internal quotations omitted).
 
 
 [9]
 Contrary to the Government's intimations, that a party suffers the consequences for its counsel's misconduct is part and parcel of our system of representative litigation. See Link, 370 U.S. at 633-34 & n. 10, 82 S.Ct. at 1390 & n. 10
 
 
 [10]
 Nolen was the recipient of one letter in particular that Barnhill thought would be helpful to his defense. That was a correspondence--albeit dated prior to time of the quarters in question--from Lewis Polster, then President and Chairman of Josam, in which Polster claimed sole responsibility for the company's tax situation. This letter was admitted into evidence before Nolen was called to testify via the authentication and foundation testimony of another witness
 
 
 [11]
 Barnhill and Security suggest that in light of the message from Nolen that Snoeyenbos received during trial on Tuesday at about 2 o'clock, Snoeyenbos' assertion to the court several hours later that he did not know where Nolen was that afternoon was not truthful. The district court, however, did not rest its decision on this ground, apparently crediting both Snoeyenbos' claim that he did not deduce Nolen's whereabouts from the note and the genuineness of his denials of such knowledge
 
 
 [12]
 The district court felt that this failure was aggravated by an indication Snoeyenbos gave in his Friday conversation with Volk that he would likely bring such a motion with respect to the adequacy of service. The Government and Petitioners urge that the court's assumption--that the Friday discussion referenced defectiveness of service and not just relevance--is erroneous. Although the only indication in the record that Petitioners were aware of service problems on Friday was Volk's allegation that Snoeyenbos fell silent momentarily upon learning service was effectuated by mail, we do not believe that the district court's assumption was central to its decision and we will not explore it further