Stefan DIETTRICH, Plaintiff–Appellee,

v.

NORTHWEST AIRLINES, INC., Defendant–Appellant.

No. 97–2831.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1998.

Decided Feb. 16, 1999.

Lawrence G. Albrecht (argued), First, Blondis, Albrecht, Bangert & Novotnak, Milwaukee, WI; Curry First, First, Blondis, Albrecht, Bangert & Novotnak, Milwaukee, WI, for Plaintiff–Appellee.

Ely A. Leichtling (argued), Quarles & Brady, Milwaukee, WI, for Defendant–Appellant.

Before FLAUM, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

When Northwest Airlines reorganized its sales department in the summer of 1992, Stefan Diettrich, a 28–year veteran of the airline's sales force, lost his job. Northwest claimed that it terminated Diettrich because he failed to demonstrate the kind of aggressiveness and drive the company needed to survive in the increasingly competitive market for air travel. Diettrich maintained the real reason was his age (53) and brought this suit under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.* After a jury returned a verdict in Diettrich's favor and the district court entered an award for damages and attorneys' fees, Northwest moved for judgment as a matter of law or, in the alternative, a new trial. The motion was denied. For the reasons that follow, we reverse the judgment of the district court.

## I

From 1967 until 1992, Diettrich worked as an account manager for Northwest Airlines (or its predecessors, North Central and Republic Airlines) in its Milwaukee office. In that capacity, he was responsible for convincing travel agencies and businesses to use Northwest. To that end, he made sales calls, talked with customers, and solved customers' problems. By all reports, he had been quite successful in his job. For example, he had been recognized by serving as the chair of the Milwaukee Airlines Managers Association, and he had well-developed relationships with key travel industry personnel throughout the area.

Unfortunately, as of the summer of 1992, Northwest (like many other airlines) was facing financial difficulties: fuel prices were skyrocketing, passenger travel was depressed because of the fallout from the Persian Gulf War, and a competing airline had just decided to establish a new pricing structure that dramatically cut the price of business travel. Business fares are the bread and butter of any major air carrier, and a decline in corporate business would have been catastrophic for Northwest. Northwest decided that it needed to reorganize its sales force to pursue corporate accounts more aggressively. Although the reorganization did not (at least at that time) involve a reduction in force, no salesperson was guaranteed a position. Instead, they all had to re-apply formally for their jobs.

In re-evaluating its employees for purposes of "rehiring," Northwest decided not to rely on past job evaluations, which the company believed were inflated. Instead, it opted to select its candidates for sales positions principally on the basis of one-on-one interviews. Russell Hinckley, a regional director of sales for Northwest, was given the responsibility for conducting those interviews for employees in the greater Chicago region, which included Diettrich's Milwaukee office. Although Northwest supplied Hinckley with a 14–page interview guide detailing techniques and questions designed to help him identify desirable candidates, it did not otherwise train him in interviewing techniques.

Taking the company at its word, Hinckley placed little weight on the cover letter and resume Northwest required each employee to furnish in connection with her job application, and he emphasized the interviews. Hinckley testified that he was looking for answers that demonstrated that the candidates were aggressive, results-oriented people who understood the critical situation the airline was in and the need to change the way the sales force was doing business.

Hinckley interviewed 12 Northwest employees, including Diettrich, who had re-applied for a position as an account manager. At the time, Hinckley did not know the ages of the candidates, who ranged from 28 to 53 years old. At 53, Diettrich was the oldest, though not by much—the next oldest were 52 and 51, respectively. Although Hinckley was not required to fill the account manager positions with current employees, there were enough positions available so that he could have re-hired each of the 12 applicants.

By chance, Hinckley interviewed Diettrich first. Perhaps because of that fortuity, Hinckley experimented on Diettrich with several questions that he abandoned in later interviews. As a result, Diettrich faced different questions from those posed to the other applicants, including the two other ap-

plicants who were over 50. Diettrich's interview, which lasted 30 minutes, was also ten minutes shorter than the interviews given to the others. Hinckley assigned a numerical rating to each interviewee and took notes on his subjective impressions. Of the 12 employees interviewed, Diettrich received the lowest score. The next oldest candidates, the 52–year–old and the 51–year–old, received the next lowest scores. After conducting the interviews, Hinckley re-hired everyone except Diettrich. He filled the remaining account manager positions with Northwest employees from different departments and with external candidates.

Convinced that age discrimination was at work, Diettrich filed this ADEA suit against Northwest. The parties agreed to sever the liability and damages portions of the case. The jury was to determine liability and, if it found liability, it was also to decide whether Northwest's actions were "willful" for purposes of liquidated damages. The parties agreed that the district court would decide all other issues pertaining to damages. After the district court denied Northwest's motion for summary judgment, the case went to trial. The jury found in favor of Diettrich on his claim of age discrimination, but it also found that Northwest's actions were not willful. The district court then awarded Diettrich $7,311.23 as back pay damages, commenting later in its decision and order on fees that this award "largely reject[ed] [Diettrich's] theory of damages." After denying Northwest's alternative post-trial motions for judgment as a matter of law or a new trial, the court awarded Diettrich $101,784.75 in attorneys' fees and costs.

## II

■ Before we turn to the substance of Diettrich's ADEA claim, we must address a disturbing episode of attorney misconduct that marred the course of the proceedings before the district court. After the jury returned its verdict, the district court granted Northwest permission to interview jurors informally for its attorneys' education, as is within the court's power under Eastern District of Wisconsin Local Rule 8.07. Northwest's attorneys abused this grant of permis-

sion. The district court permitted them to interview jurors to learn which trial techniques worked and which did not, so that the attorneys could use the information for future trials. Instead, Northwest relied on its lawyers' post-verdict dialogue with the jury (during which, according to Northwest, jurors suggested that they found Hinckley to be a credible witness) to support its motions for overturning the jury verdict.

The conduct of Northwest's lawyers was clearly out of bounds. As the district court pointed out, Northwest inappropriately "invite[d] the court to open the black box that is the jury room." Northwest violated both Local Rule 8.07, by going far beyond the scope of the district court's permission, and Wisconsin Supreme Court Rule 3.5 (an exact copy of ABA Model Rule of Professional Conduct 3.5), which prohibits lawyers from communicating *ex parte* with jurors "except as permitted by law." Wisc. Sup.Ct. R. 20:3.5. The district court appropriately chastised Northwest for its highly improper behavior.

■ Diettrich argues that Northwest's misconduct was sufficiently grave that this court should punish Northwest by affirming the jury's verdict. We agree that this was a serious transgression. Nevertheless, as in all cases the punishment must fit the crime. It is true that the federal courts have the inherent power to "fashion ... appropriate sanction[s] for conduct which abuses the judicial process," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), and that in appropriate cases this power would even permit a court to impose the ultimate sanction of a grant of judgment (or its equivalent, dismissal with prejudice). See *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir.1993); see also *Chambers*, 501 U.S. at 45, 111 S.Ct. 2123. Nevertheless, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123. This court has repeatedly recognized the need to be cautious when imposing the draconian remedy of terminating the underlying action in favor of one party. *Kovilic Constr. Co., Inc. v. Missbrenner*, 106 F.3d

768, 773 (7th Cir.1997); *Barnhill,* 11 F.3d at 1367.

A number of reasons persuade us that affirmance of the jury verdict would not be the appropriate sanction here. Most importantly, Diettrich was not prejudiced by Northwest's misconduct. In evaluating Northwest's post-trial motions, the district court expressly stated that it would disregard Northwest's impermissible materials. Based on permissible materials alone, the court found that Diettrich had submitted sufficient evidence to sustain the verdict. Thus, we are confident that Northwest's misconduct did not contaminate the district court's review.

We are equally certain that our own review is untainted by Northwest's improper reference to the jury deliberations. The key issue presently before us is the correctness of the district court's denial of Northwest's renewed motion for judgment as a matter of law, which is something we review *de novo*. *Emmel v. Coca–Cola Bottling Co.,* 95 F.3d 627, 629 (7th Cir.1996). We therefore neither can nor should take into account any evidentiary disputes, except insofar as their legitimate existence would support the district court's decision to allow the jury verdict to stand.

Our refusal to impose the sanction of affirming the jury's verdict does not mean that misconduct like Northwest's must go unpunished. We think the proper authorities in the first instance for reviewing this matter are the tribunals whose rules of conduct have been violated: that is, the District Court for the Eastern District of Wisconsin and the Supreme Court of Wisconsin, through the Wisconsin Board of Attorneys Professional Responsibility. Although the district court has already considered this matter once, it may wish to reconsider its evaluation of the proper course of action in light of our decision that Northwest is entitled to judgment as a matter of law. We also instruct the Clerk of this Court to forward a copy of this opinion to the Wisconsin Board for its information.

## III

On the merits, Northwest argues that the district court should have granted its motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. In undertaking this task after a full trial, we do not need to march through the familiar steps of the indirect, burden-shifting method of proof established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* framework is designed to help plaintiffs raise an inference of discrimination during pretrial proceedings. After the trial on the merits, the burden-shifting apparatus has served its purpose and the required preliminary showings fall away. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Mattson v. Schultz,* 145 F.3d 937, 938 (7th Cir.1998); *Achor v. Riverside Golf Club,* 117 F.3d 339, 340–41 (7th Cir.1997); *Gehring v. Case Corp.,* 43 F.3d 340, 343 (7th Cir.1994). At this point, we need ask only whether the plaintiff was a victim of intentional discrimination, that is, whether Diettrich would have been re-hired if he had been younger and everything else had been the same. *Achor,* 117 F.3d at 340; *Gehring,* 43 F.3d at 343.

Diettrich's evidence of age discrimination was entirely circumstantial—a fact that in itself means little, if it would have permitted a reasonable jury to infer that he lost his job because of his age. Specifically, he argues that the interview process was administered unfairly and to his detriment. He points to evidence that Northwest never trained Hinckley to conduct interviews, that Hinckley abandoned the format set forth in Northwest's interview guide in favor of a more variable approach, that Hinckley asked Diettrich different and "more difficult" questions than he did the other candidates, that Hinckley gave Diettrich a shorter interview than the others, and that Hinckley disregarded Diettrich's resume and cover letter and did not otherwise elicit information regarding Diettrich's extensive work history and experience in sales.

Unfortunately for Diettrich, even if this evidence showed that Northwest did not

know how to conduct a reliable selection process, none of these flaws has a hint of age bias to it. It may be that the interview process did not measure the traits Northwest wanted in its reorganized sales force. It may be that Hinckley did not appreciate how aggressive and results-oriented Diettrich really is. But use of a subjective, even arbitrary, selection process is not proof of discrimination. See *Richter v. Hook–SupeRx, Inc.*, 142 F.3d 1024, 1031–32 (7th Cir.1998); *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 515 (7th Cir.1996). For all we know, Hinckley was not impressed with Diettrich for any one of a myriad of other, non-actionable reasons. For example, Hinckley may have decided that Diettrich was wrong for the job because Hinckley disliked the clothes Diettrich wore to the interview or he found Diettrich's conversation boring. If this were the case (and there is no evidence to suggest that it is), we might question the good sense of Northwest's hiring decisions, but we could not hold Northwest liable for discrimination. To prevail, Diettrich must provide evidence not only that he was treated differently, but that he was treated differently because of his age. This he never did.

Diettrich likens his case to *Tincher v. Wal–Mart Stores, Inc.*, 118 F.3d 1125 (7th Cir.1997), in which this court upheld a jury finding of discrimination even though the evidence of pretext was "tenuous." *Id.* at 1131. In *Tincher*, the plaintiff presented evidence that her supervisors had responded to her requests for accommodation to her religious practices with arguably anti-religious statements. *Id.* Because some evidence tied the adverse job action to the protected category, the jury was entitled to decide the case. In contrast, most of Diettrich's evidence implies only that his supervisors had a flawed selection process, not that they had a discriminatory motive.

The one piece of evidence Diettrich offers that even arguably suggests that Hinckley's decision was influenced by his age is the pattern that emerges from the ratings Hinckley gave the 12 candidates who reapplied for the account manager positions. The youngest among the 12 received the highest score, while the three oldest applicants scored lowest. Diettrich is not trying to show that the scoring decisions had a disparate impact on Northwest's older employees—a theory of age discrimination that is unavailable in this circuit, see *Maier v. Lucent Technologies, Inc.*, 120 F.3d 730, 734–35 & n. 4 (7th Cir.1997); *Gehring*, 43 F.3d at 342. Instead, Diettrich wants to use the ratings to establish the proposition that Hinckley favored younger employees, which in turn would buttress his claim that the reason for his discharge was age.

This evidence will not bear the burden Diettrich asks of it. As his attorney acknowledged at oral argument, the sample of 12 is not statistically significant, which means that the correlations between age and score could have fallen as they did by pure chance. Moreover, statistical significance aside, this sample still would not permit an inference of age discrimination. There were enough jobs available for all 12 candidates, so Hinckley did not offer a limited number of jobs to the youngest applicants. While it is true that the three oldest candidates received the three lowest scores, 11 of the 12 applicants—including the second- and third-oldest applicants (only one and two years younger than Diettrich)—received offers. Hinckley did not know the ages of the candidates, and by "eyeballing" alone he could not have determined that Diettrich was older than the two fifty-something candidates who did get jobs.

Reluctant as we are to overturn a jury verdict, we have no choice but to do so in a case like this, in which the evidence did not justify submitting the case to the jury in the first instance. The district court's denial of judgment as a matter of law is REVERSED, and the award of damages and attorneys' fees is VACATED.

FLAUM, Circuit Judge, concurring in part *and* dissenting in part.

I join the court's opinion with respect to the merits resolution of this appeal. I write separately because I am unable to associate myself with my colleagues' disposition of the improper post-verdict conduct attributed to the attorneys for Northwest Airlines. Clearly, the misuse of the juror interviews deserves appropriate admonishment. As the

record discloses, the district court addressed this subject when considering the post-trial motions. In this case an experienced jurist decided not to proceed beyond his critical comments of counsel. If he had chosen, as an initial matter, to impose a harsher sanction I would not take exception to such a result. However, I would not, in the context of this litigation and from our detached appellate vantage point, invite the trial judge to revisit the issue. Nor would I, in advance of further reflection by the district court, direct the Clerk of this Court to forward a copy of this opinion to the Wisconsin Board of Attorneys Professional Responsibility. The violation of the Eastern District of Wisconsin Local Rule 8:07 has been duly noted by the district court and now by this tribunal in a published opinion. In my judgment, this dual recognition and condemnation of the performance in question should suffice.