Talitha **TINCHER**, Plaintiff–Appellee,

v.

**WAL–MART STORES, INC.,**
Defendant–Appellant.

No. 96–2713.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1997.

Decided June 20, 1997.

Michael C. Kendall, Stephanie J. Hahn (argued), Indianapolis, IN, for plaintiff-appellee.

Gus Sacopulos, Gregory S. Carter (argued), Sacopulos, Johnson, Carter & Sacopulos, Terre Haute, IN, for defendant-appellant.

Before CUMMINGS, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Talitha Tincher sued Wal–Mart under Title VII, alleging that the company discriminated against her because of her religion. Specifically, Tincher claimed that Wal–Mart failed to reasonably accommodate her observance of the Sabbath and that Wal–Mart eventually terminated her to rid themselves of the burden of accommodating her religious observances. After a three-day trial, a jury returned a verdict in Tincher's favor, including an award of punitive damages, finding that Wal–Mart intentionally discriminated against Tincher. Wal–Mart promptly moved for a judgment as a matter of law, challenging both the liability determination and the punitive damages award. The district court denied Wal–Mart's motions.

On appeal, neither party disputes that Tincher presented a prima facie case of discrimination or that Wal–Mart provided a legitimate, nondiscriminatory reason for firing Tincher. Thus, we need only address whether Wal–Mart's asserted reason for the termination was pretextual and whether the punitive damage award was appropriate. We affirm the finding of liability because Tincher presented enough evidence from which a reasonable jury could infer that Wal–Mart proffered a pretextual reason for Tincher's firing. We vacate the punitive damage award, however, because no reasonable factfinder could have found that Wal–Mart acted with a callous disregard for Tincher's rights or intentionally violated federal law.

## I. History[1]

Talitha Tincher is a member of the Seventh Day Adventist Church, and she began actively practicing that religion in September 1989. Tincher first worked at the Wal–Mart in Greencastle, Indiana in 1988. She left that job in order to pursue her education, and she later returned to the Greencastle Wal–Mart in the summer of 1989. In her first stint at Wal–Mart, Tincher never re-

---

1. Because we are reviewing the denial of motions for judgment as a matter of law, we present the facts in the light most favorable to plaintiff, the nonmoving party. *See Emmel v. Coca–Cola Bottling Co.,* 95 F.3d 627, 629 (7th Cir.1996).

quested that the store make any accommodation for her in regard to her religion. When she returned in 1989, Tincher indicated on her employment application that she was unavailable to work from 6 pm on Fridays to 7:30 pm on Saturdays. Tincher, however, worked whenever she was scheduled up until the time she verbally requested that the store accommodate her religious needs.

At some point in 1990, Tincher approached the store manager, Peter Newbal, asking him to transfer her to the stocking crew because that job would not include Saturday work and thus not interfere with her practice in the Seventh Day Adventist Church. In response, Newbal rolled his eyes and replied, "Oh yeah, I know all about them." On a few occasions, Tincher was scheduled to work on the Sabbath, and Tincher would have to remind Newbal or Debbie Davis (an assistant manager) about her schedule request. On these occasions, Wal–Mart always accommodated Tincher.

Tincher worked in the stocking crew for two months until she was promoted to Domestics Department Manager, another position that did not require her to work on the Sabbath. Newbal later approached Tincher about transferring to the UPC (universal product code) department. This department handles the store's bar coding and computer pricing needs. Tincher expressed her interest in a UPC position so long as it would not interfere with her observance of the Sabbath. Newbal assured Tincher that he would accommodate her, and Tincher took the UPC position.

Tincher worked in the UPC department with David Sutherlin and Tonya Hunter, and the three of them were apparently good friends. Hunter served as the "head clerk" of the UPC department and sometimes left instructions for Sutherlin and Tincher. As the "head UPC clerk," however, Hunter was not a member of management. Davis, one of the store's assistant managers, supervised the UPC office as part of her general responsibilities.

One night in December 1991, Sutherlin and Tincher were engaged in "horseplay" while working in the UPC office. Sutherlin asked Tincher to help him guess the store manager's (Newbal's) computer password. Sutherlin and Tincher were not authorized to access Newbal's computer database. Tincher successfully suggested Newbal's birth year as part of the password. Sutherlin somehow came up with the rest of the code, entered the database, and informed Tincher of his access. Tincher never actually "keyed in" the password to enter the database herself. Nonetheless, Tincher knew that accessing the computer "would be trouble," and the next day, Tincher told Hunter what she and Sutherlin had done. Tincher contacted Hunter under the belief that Hunter, as the "head UPC clerk," was her "immediate supervisor" and thus the first person she should contact about any problems pursuant to company policy. Hunter showed little interest in Tincher's concerns, and she refused to go with Tincher to tell management about what had happened. At some point after this conversation, Hunter and Sutherlin used the password to give themselves unauthorized pay raises. Tincher never used the password to enter the manager's database, nor did she ever give herself an unauthorized raise.

About two months after this incident, Tincher began work in another capacity at Wal–Mart. Newbal apparently approached Tincher (because of her seniority) about moving to another position (apparently in data entry) outside the UPC department as that office was becoming overcrowded. Tincher asked if the new position would require her to work on Friday nights and Saturdays. Newbal replied that the new job would require work on those days, and Tincher voiced her objections. At that point, Newbal replied, "Well, what do you think I ought to do? Fire you?" Tincher became upset because she had gone to school to learn data entry, and she viewed this position as a good opportunity. Newbal eventually assigned Tincher to a test scanner position, a relatively new job that required no special training. Tincher considered this move a "demotion" although neither her pay nor her benefits decreased.

Around this same time, Tincher inadvertently interrupted a conversation between Hunter and Brenda Stinson, another UPC

worker; they were discussing the fact that Sutherlin had given himself a pay raise by accessing the manager's database. Tincher and Stinson both told Hunter to report the incident to management, and Hunter promptly called Newbal. Although Tincher wanted to participate in Hunter's conversation with Newbal, Hunter spoke to Newbal alone. At this point, Tincher believed that the appropriate management people had been contacted regarding the computer access incident. It is unclear, however, whether Hunter told Newbal about the computer security breach on that day or at a later time.

About two or three months later, on April 2, 1992, Wal–Mart terminated Hunter and Sutherlin because they used Newbal's computer password to give themselves unauthorized pay raises. The next day, Davis and an employee from the safety and loss prevention department met with Tincher for about an hour to discuss the computer password incident and the firing of Hunter and Sutherlin. They told Tincher that her job was safe if she told the truth because they knew that she did not give herself a pay raise. That same day, Newbal met with Wal–Mart District Manager Curtis Morgan and apprised him of the situation. Morgan—who had no knowledge of Tincher's religion—received his only information regarding the password incident from Newbal. Upon hearing that Tincher accessed the computer and gave the password to other employees, Morgan directed Newbal to fire Tincher even though Morgan knew that Tincher did not give herself a pay raise. Later that day, Newbal fired Tincher and had Davis escort her out of the building. The exit interview form signed by Newbal listed the reasons for Tincher's termination as misusing equipment, violating company policy, and "getting access into computer under manager's password—and not letting management know." When questioned with several hypotheticals on cross-examination at trial, Morgan testified that he might not have given the "okay" to terminate an employee who only "guessed" a computer password and then notified an immediate supervisor of the computer breach the next day.

On August 25, 1993, Tincher filed a complaint in the Putnam County Circuit Court against Wal–Mart, Newbal, Davis, and several "John Doe" defendants. Tincher brought two claims. Her first claim alleged that the defendants discriminated against her on the basis of her religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (as amended by the Civil Rights Act of 1991), and the First and Fourteenth Amendments to the United States Constitution. Tincher's second cause of action alleged state common-law defamation violations. The case was subsequently removed to the United States District Court for the Southern District of Indiana, and apparently assigned to Magistrate Judge William Hussmann who commenced trial on October 31, 1995.

At the conclusion of Tincher's case-in-chief, the district court granted Wal–Mart's motion for a judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 as to the defamation claims against all the defendants and as to the discrimination claims against Davis and Newbal. The court also dismissed the claims against the unnamed "John Doe" defendants based on its lack of jurisdiction over them. At the close of all the evidence, Wal–Mart—the only remaining defendant—renewed its Rule 50 motions seeking judgments against Tincher on her religious discrimination claim and her prayer for punitive damages. The district court denied both motions.

On November 2, 1995, the jury returned a verdict for Tincher, awarding her $6,000 in back pay, $3,000 in compensatory damages, and $250,000 in punitive damages. At this point, Wal–Mart orally renewed its motions for judgment notwithstanding the verdict (i.e., judgment as a matter of law) pursuant to Rule 50(b). Wal–Mart subsequently filed written motions for judgment as a matter of law and an alternative motion for a new trial pursuant to Federal Rule of Civil Procedure 59.

On May 31, 1996, the district court denied Wal–Mart's motions for judgment as a matter of law. In denying the motion with respect to the religious discrimination claim, the court ruled that no rational jury could

have found that Wal–Mart failed to reasonably accommodate Tincher's requests regarding the Sabbath. The court therefore affirmed the jury's verdict solely on the theory that one could reasonably conclude that Wal–Mart's proffered a pretextual reason for firing Tincher. In addition, the court gave Tincher fifteen days to consider whether she would accept a remittitur of the $250,000 punitive damage award or face a new trial on that issue. Tincher ultimately accepted the remittitur, and on June 20, 1996, the district court entered an amended judgment reducing the punitive damages to $90,000. Wal–Mart now appeals the denial of its motions for judgment as a matter of law on the religious discrimination and punitive damages issues.

## II. Analysis

### A. Standard of Review

We review *de novo* the denial of a motion for judgment as a matter of law. *Emmel v. Coca–Cola Bottling Co.*, 95 F.3d 627, 629 (7th Cir.1996). Rule 50 of the Federal Rules of Civil Procedure permits a court to grant a motion for judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue." Our inquiry here requires us to examine the evidence presented, combined with any reasonably drawn inferences, and determine whether that evidence sufficiently supports the verdict when viewed in the light most favorable to the non-moving party. *Emmel*, 95 F.3d at 629. "In other words, we are limited to assessing whether no rational jury could have found for the plaintiff." *Id.* at 630.

We rigorously apply this lofty standard when reviewing a jury's verdict in a discrimination case. *Id.; Christie v. Foremost Ins. Co.*, 785 F.2d 584, 586 (7th Cir.1986). And in doing so, we avoid supplanting our views regarding witness credibility and the weight of the evidence for those of both the judge and the jury. *Emmel*, 95 F.3d at 630; *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir.1990).

### B. Pretext

■ At the close of the evidence, the district court denied Wal–Mart's Rule 50 motion requesting a judgment in its favor with regard to Tincher's religious discrimination claim. Our review of this denial requires two steps. First, we must determine whether Wal–Mart preserved its right to appeal the issue by properly moving for a judgment as matter of law (or under the old terminology, a directed verdict) before the judge submitted the case to the jury. *See Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1139 (7th Cir.1994); *see also* Fed.R.Civ.P. 50. Next, we must determine whether the trial included "sufficient evidence for a reasonable jury to find that [religion] was a determining factor in [Tincher's] termination." *Downes*, 41 F.3d at 1139. In this regard, the "evidence must have been substantial—a mere scintilla will not suffice." *Id.* In this case, Wal–Mart preserved its right to appeal the liability issue by making a Rule 50 motion at the close of the evidence. Thus, our inquiry will focus on whether a reasonable jury could find that religion was a determining factor in Tincher's firing.

Tincher chose to present her religious discrimination case via the indirect evidence method of proof applied in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The parties in this case do not dispute that Tincher demonstrated a prima facie case of discrimination and that Wal–Mart provided a legitimate, nondiscriminatory reason for Tincher's termination. Thus, the *McDonnell Douglas* framework "drops out of the picture" leaving Tincher with the ultimate burden of proving the discrimination by showing that Wal–Mart provided a pretextual reason for her termination. *See Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 668 (7th Cir.1995); *see also EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 149 (7th Cir. 1996).

"Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'" *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919 (7th Cir.) (quoting *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.

1995)), *cert. denied,* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). The pretext inquiry focuses on the honesty—not the accuracy—of the employer's stated reason for the termination. *See Helland v. South Bend Community Sch. Corp.,* 93 F.3d 327, 330 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 769, 136 L.Ed.2d 715 (1997). Thus, when the stated reason for termination is not the actual reason, it is pretextual. *Id.* The mere fact that the employer acted incorrectly or undesirably, however, cannot adequately demonstrate pretext; rather, the employee must prove that the employer did not honestly believe the reasons it gave for the firing. *Wolf,* 77 F.3d at 919. A plaintiff can prove the incredibility of the employer's proffered reason for the termination, and thereby demonstrate pretext, by showing that the employer's proffered reasons are (1) factually baseless, (2) not the actual motivation for the discharge, or (3) insufficient to motivate the discharge. *Id.* Moreover, the "fact-finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination." *Perdomo v. Browner,* 67 F.3d 140, 145 (7th Cir.1995) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)).

In this case, the district court determined that the jury's verdict could not have been supported by evidence that Wal–Mart failed to reasonably accommodate Tincher's religious requests. The court, however, held that a rational jury could have reasonably concluded that Wal–Mart's proffered reason for the discharge was pretextual. Relying on *Wolf,* the court reasoned that Tincher provided sufficient evidence of pretext because Wal–Mart's proffered reason for the termination—gaining access to the computer and not telling management—was factually base-

less. *See Wolf,* 77 F.3d at 919. We do not agree with the court's assessment of the pretext evidence.

■ It is true that Tincher never actually typed the password into the computer, nor perused the manager's computer database. These facts, however, do not make false the broad statement that she gained access to the computer. Gaining access to a computer password is, in a legitimate sense, gaining access to the computer. Moreover, Wal–Mart correctly noted that Tincher did not tell management about the computer breach. Both Tincher and the district court reasoned that Tincher did inform management about the password incident because Tincher told Hunter, the "head UPC clerk." The testimony at trial, however, revealed that Hunter was not part of "management." Tincher's own testimony reveals this fact—she stated that she wanted Hunter to go with her "to management and tell them what happened." Tincher's testimony also revealed that when she originally told Hunter about the computer breach (on the morning after the initial access), she knew that Hunter would not inform management of the problem. Tincher again asked Hunter to tell management of the computer breach after she overheard a conversation between Hunter and Stinson discussing Sutherlin's use of the access code to give himself a raise; at that point, Tincher believed that Hunter did raise the issue with management (Newbal). But this later belief regarding management's knowledge of the incident does not change the fact that Tincher never told management about the incident herself and that Tincher knew the incident went unreported to management for a few months after the initial security breach. Looking at these facts, even in the light most favorable to Tincher, we cannot conclude that Wal–Mart provided a factually baseless reason for Tincher's termination.[2]

---

2. Tincher claims that Wal–Mart's dissimilar treatment of Brenda Stinson—a fellow employee who later became aware of the computer breach, did not inform management of the breach, was not a Seventh Day Adventist, and was not terminated—provides further evidence of pretext. We do not agree with Tincher or the district court that Wal–Mart's treatment of Stinson demonstrates the company's pretextual intent. At the

time Wal–Mart fired Tincher, neither Morgan nor Newbal knew that Hunter had talked with Stinson about the password and the raises. Thus, it is irrelevant that the company (via Morgan and Newbal) fired Tincher and not Stinson.

Moreover, Tincher and Stinson were not similarly situated. Tincher provided Sutherlin with the password, she knew that Sutherlin accessed the computer, and then Tincher did not tell man-

This finding, however, does not end our analysis. The tougher (and much more amorphous) question is whether a rational jury could have concluded that the proffered reason for the termination was pretextual because Wal–Mart was not actually motivated by this reason. *See Wolf,* 77 F.3d at 919. The facts of this case reveal that any finding of pretext must run through the motivations of Newbal, the store's manager. The uncontroverted evidence at trial provided that District Manager Morgan—the person who directed Newbal to terminate Tincher—received all of his information regarding the password incident from Newbal. Moreover, Morgan had no knowledge of Tincher's religious beliefs. Thus, the only way the jury could have found pretext is if it believed that Newbal "did not honestly believe in the reasons [he] gave for firing [Tincher]." *See Wolf,* 77 F.3d at 919; *cf. Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1400 (7th Cir.1997) (discussing the imputation of discriminatory intent).

■ Our review of the evidence in the light most favorable to Tincher leads us to conclude that a rational trier of fact could have reasonably rejected the credence of Wal–Mart's (*i.e.,* Newbal's) proffered reason for Tincher's firing. Newbal provided arguably incomplete and misleading information concerning Tincher's participation in the computer password incident; he told Morgan that "an associate had gained access to his password" and "had informed other associates of the password," that the other associates "had given [themselves] raises through using his password," and that "the associate that had gained the password didn't actually give herself a raise." This information prompted Morgan to question the honesty and integrity of those involved, and therefore he instructed Newbal to fire all of them, including Tincher. The testimony at trial, however, revealed that Newbal could have presented a more accurate account of the password incident that would

have minimized the extent of Tincher's wrongdoing. Morgan's own testimony provides the crucial piece of evidence in this regard—he testified that he may not have terminated an employee who merely guessed the manager's password while kidding around with another associate and who told her immediate supervisor about the incident the very next day.

In addition to the testimony involving Tincher's termination, Tincher provided evidence detailing Newbal's arguably-disparaging conduct regarding Tincher's religious practices. This evidence includes: Newbal rolling his eyes while commenting "Oh yeah, I know all about [the Seventh Day Adventists]" after Tincher originally asked for accommodation in 1990; Wal–Mart's occasional scheduling of Tincher to work on Friday nights and Saturdays despite her requests for accommodation; and Newbal's response of "Well, what do you think I ought to do? Fire you?" after Tincher objected to taking a data entry job in which she would have had to work on Friday nights and Saturdays. The circumstances underlying Tincher's swift termination, coupled with this questionable conduct, could lead a rational jury to reject the credence of Wal–Mart's proffered reason for the termination and infer that Wal–Mart fired Tincher because of her religious beliefs.

Admittedly, this evidence of pretext is tenuous; and we are mindful that we must "avoid stepping into the role of super-personnel department" and "not second-guess legitimate business decisions," *Emmel,* 95 F.3d at 633. But as an appellate court reviewing the rationality of a jury verdict—especially in an employment discrimination case—we also have a duty to respect the factfinder's credibility determinations and refrain from weighing the evidence ourselves in an attempt to reach our own conclusion. *See id.* at 630. The jury in this case has spoken, and although its rationale eludes us because of the very nature of a general jury verdict (as opposed to a special verdict or a general

---

agement even though she knew that Hunter—her "immediate supervisor" and close friend—would not do so. Stinson, on the other hand, found out about the password incident much later and she directed Hunter to tell management. The fact that Tincher joined in Stinson's advice does not

alter our analysis. As a result of this advice, Hunter reported the incident to Newbal and thus set in motion the termination of the three employees originally involved in the computer security breach.

verdict accompanied by interrogatories),[3] its decision was not unreasonable.

### C. Punitive Damages

At the close of the evidence, the district court denied Wal–Mart's motion to withdraw the issue of punitive damages from the jury, and it subsequently denied Wal–Mart's written Rule 50 motion for a judgment as a matter of law on the punitive damages issue. As with the liability issue, Wal–Mart properly preserved this question for appeal, and thus we must determine whether a reasonable jury could have awarded punitive damages against Wal–Mart.

In *United States v. Balistrieri,* 981 F.2d 916, 936 (7th Cir.1992), we stated that "[p]unitive damages are appropriate in cases of 'reckless or callous disregard for the plaintiff's rights, [or] intentional violations of federal law.'" *Id.* (quoting *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637–38, 75 L.Ed.2d 632 (1983)). We also explained that under *Smith,* punitive damages are within the jury's discretion "if the conduct upon which liability is founded evidences reckless or callous disregard for the plaintiff's rights or if the conduct springs from evil motive or intent." *Id.* (quoting *McKinley v. Trattles,* 732 F.2d 1320, 1327 (7th Cir.1984)).

In *Emmel,* we further commented on the appropriateness of punitive damages in employment discrimination cases. Significantly, we reasoned that for plaintiffs to receive a punitive damage award, they must jump "a higher hurdle than merely proving the underlying unlawful discrimination." *Em-*

*mel,* 95 F.3d at 636. In other words, a plaintiff must go beyond proving that the "intentional unlawful discrimination was more likely than not the reason underlying the adverse employment decision in question." *Id.* Rather, the employee "must prove that the defendant employer engaged in the discriminatory practice 'with malice or with reckless indifference to the federally protected rights' of the employee." *Id.* (quoting 42 U.S.C. § 1981a(b)(1)). To require otherwise, of course, would permit every employment discrimination claim to include a punitive damage award because every employment discrimination plaintiff must demonstrate an intentional unlawful discrimination.

In this case, the district court relied on *Balistrieri* in allowing the jury to consider an award of punitive damages, reasoning that a plaintiff need only show an intentional violation of federal law—not a reckless or callous disregard for plaintiff's rights. The court later refused to set aside the jury's punitive damage award [4] because "there [was] evidence which a jury could accept that Peter Newbal intentionally terminated plaintiff because her religious tenets upholding the Sabbath imposed some additional administrative burdens upon him, that he intentionally discharged the plaintiff to rid himself of these burdens, and that he gave false reasons on her exit interview to cover up his decision to terminate her." Based on this evidence, the court reasoned that the jury could have reasonably concluded that Wal–Mart (through Newbal) either acted with callous disregard for Tincher's rights or intentionally violated

---

3. We find it somewhat inconsistent that we must address how the jury *could have* reached a finding of pretext considering the fact that the final jury instructions provided no guidance regarding pretext. Jury Instruction No. 11 provides, in part, "With respect to termination, if Wal–Mart shows that Talitha Tincher was fired for a good faith reason other than her religious preference, she may still show that this reason was only a pretext for religious discrimination." Other than this instruction, which goes on to extensively discuss other adverse employment actions regarding reasonable accommodation, the jury instructions do not mention pretext. In fact, Jury Instruction No. 12, which discusses Wal–Mart's alleged legitimate non-discriminatory reason for the termination, fails to mention pretext: "If you find that Wal–Mart had a legitimate non-discrim-

inatory reason for terminating the employment of Talitha Tincher, *your verdict must be for the defendant* Wal–Mart on the claim of religious discrimination." (Emphasis added.) Because the jury found Wal–Mart liable, (and assuming that juries follow the judge's instructions), we can reasonably conclude that the jury must have found that Wal–Mart did not provide a legitimate non-discriminatory reason for Tincher's firing. On appeal, however, both parties have conceded that Wal–Mart did provide such a legitimate non-discriminatory reason.

4. As noted above, the district court actually gave Tincher the option of accepting a remittitur of the punitive damage award or retrying the issue of punitive damages.

federal law. In light of the legal analysis from our recent decision in *Emmel* (which the district court did not have the benefit of examining when it issued its ruling) and our review of the evidence in the light most favorable to Tincher, we disagree that a reasonable jury could determine that Wal–Mart's conduct warranted an award of punitive damages.

As explained above, the evidence at trial simply did not reflect that Newbal provided factually-baseless reasons for Tincher's termination on her exit interview form. Wal–Mart proffered a legitimate, nondiscriminatory reason for Tincher's termination—a reason that involved an unauthorized breach of the store's computer system. The issue of liability in this case was extremely close—another jury could just as easily have found that Wal–Mart's reason for the termination was not pretextual. *See Tincher v. Wal-Mart*, 945 F.Supp. 1209, 1216 (S.D.Ind.1996) (order denying Wal–Mart's motion for a judgment as a matter of law and conditionally granting Wal–Mart's motion for new trial depending on Tincher's acceptance of the remittitur). The district court appropriately permitted the jury to decide the liability issue because the evidence at trial revealed that Newbal may not have been as thorough as he should have been in investigating the password incident and in describing this incident to the district manager. This conduct, coupled with Newbal's arguably-disparaging remarks involving Tincher's religion, could raise an inference from which a reasonable jury could find that Tincher's termination had something to do with her religion.

 These actions alone, however, do not warrant a punitive damage award. As we stated in *Emmel*, "[p]unitive damages require more" than a showing that the "intentional unlawful discrimination was more likely than not the reason underlying the adverse employment decision." *Emmel*, 95 F.3d at 636. Tincher provided no evidence from which a reasonable finder of fact could determine that Wal–Mart (through Newbal) acted with a callous or reckless disregard for her rights or with an evil motive or intent. Although Newbal may not have conducted a copious investigation of the password incident or provided exacting information of that incident to Morgan, the evidence does not show that he callously lied about Tincher's role in the episode. Had Newbal cold-heartedly intended to rid himself of the burden of accommodating Tincher, he could have provided Morgan with an even less-detailed account of Tincher's involvement in the incident—perhaps one that omitted any mention of the mitigating circumstances such as the fact that Tincher never gave herself a raise.

Moreover, the most disparaging remark that Newbal made regarding the accommodation of Tincher's religious observances does not exhibit a callous disregard for her rights or illustrate any evil intent. In late 1991 or early 1992, the UPC department was becoming overcrowded and Newbal asked Tincher whether she would be willing to accept a position in data entry. Newbal first approached Tincher about the job before asking any other employees. Tincher asked whether that job would require her to work on Friday nights and Saturdays, and Newbal informed her that the position required work at those times. Tincher replied that this was "not fair," and Newbal responded, "Well, what do you think I ought to do? Fire you?" Tincher eventually became a test scanner, a position that she considered a "demotion," but also one that involved the same pay she was currently receiving, provided her the same benefits, and permitted her to take Friday nights and Saturdays off of work. Even in the light most favorable to Tincher, this incident reveals that Newbal gave Tincher the opportunity to take a data entry job—a position she wanted [5]—and then gave her another job that accommodated her religious needs when the data entry job could not do so. These nuggets of circumstantial evidence fall short of revealing that Newbal had an "evil" or "callous" attitude toward Tincher.

---

**5.** In the past (albeit not in the last year or two) Tincher did work on Friday nights and Saturdays even though she was a practicing Seventh Day Adventist and she had indicated on her employ-ment application that she could not work at those times. As such, Newbal's offer of the data entry job was not an entirely empty proposition.

Although Tincher presented enough evidence from which a rational jury could find that Wal–Mart unlawfully discriminated against her, she did not demonstrate that Wal–Mart acted egregiously in doing so. Tincher simply failed to prove that she was deserving of such an extraordinary remedy. Accordingly, we AFFIRM the district court's denial of Wal–Mart's motion for a judgment as a matter of law on the liability issue, and we VACATE the award of punitive damages.