165 F.3d 31
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Shirley BIGGS and Rebecca Delauder, Plaintiffs-Appellants,
v.
LINCOLN NATIONAL LIFE INSURANCE COMPANY, Defendant-Appellee.
 Nos. 97-3230 & 97-3252.[1]
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 19, 1998.
Decided Aug. 31, 1998.
 
 Appeals from the United States District Court for the Northern District of Indiana Fort Wayne Division. Nos. 96 C 360 & 96 C 361, Roger B. Cosbey, Magistrate Judge.
 Before Hon. JOHN L. COFFEY, Hon. DANIEL A. MANION, Hon. DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 Plaintiff-appellant Rebecca Delauder ("Delauder"), a white female, was employed by the defendant-appellee, Lincoln National Life Insurance Company ("Lincoln"), beginning in 1979. In 1993, Delauder was promoted to the position of mail room supervisor. From 1993 until 1996, Delauder's supervisors received numerous complaints from Delauder's workers in the mail room concerning her managerial shortcomings. Delauder was ultimately terminated in early September of 1996 as a result of her difficulty in supervising her employees. Plaintiff-appellant Shirley Biggs ("Biggs"), likewise a white female, was Delauder's direct supervisor at Lincoln for much of the three year period at issue. About the same time Delauder was terminated, Biggs was issued a warning for her inability to correct the problems in Delauder's department. In an effort to improve corporate efficiency, Biggs was also stripped of her supervisory duties, but continues to be employed by the defendant in a non-supervisory capacity. On September 10, 1996, Delauder and Biggs individually filed suit against Lincoln, both alleging racial and sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq. In May and June of 1997, Lincoln filed motions for summary judgment dealing with both Biggs's and Delauder's Title VII claims, which the trial court granted in August of 1997. We affirm.
 
 BACKGROUND
 A. Biggs and Delauder Join Lincoln
 
 2
 Biggs began working for Lincoln in 1975 as a Word Processor. In 1986, she was promoted to Lincoln's Facilities and Services department ("F & S"), and was reassigned as a roaming "trouble shooter." Meanwhile, Delauder joined Lincoln in 1979 as a Records File Clerk. In February of 1993, Lincoln promoted Delauder to the position of Supervisor of Mail and Transportation, a division of F & S. As head of Mail and Transportation, Delauder was in charge of 40 employees. Delauder reported directly to Biggs, who in turn reported to George Dunn, the Director of F & S.
 
 
 3
 B. The History of Problems Within Delauder's Department
 
 
 4
 Beginning in mid-1993, Lincoln began receiving complaints about Delauder from her subordinate employees. These complaints came from both male and female employees and from both African-American and white employees alike. Specifically, the employees complained that they had "difficulty communicating" with Delauder, that she was "too controlling," and that she did not treat her subordinates with respect and fairness. A few employees complained that Delauder, a white woman, discriminated against them and harassed certain African-American employees. These complaints were initially made to Biggs and Dunn, who failed to take any action against Delauder to improve the situation. The employees became frustrated because of the inaction on the part of Dunn and Biggs, and began to complain directly to Lincoln's Human Resources ("HR") and Affirmative Action and Diversity ("AAD") departments. Karen Fowler-Williams ("Fowler-Williams") served as the director of AAD, and Cynthia Barnett ("Barnett") was the HR consultant until June of 1996, when she was replaced by Candace Delanoy ("Delanoy").
 
 
 5
 In the fall of 1993, Barnett and Fowler-Williams met with Biggs and Dunn concerning the complaints. At Dunn's request, Barnett and Fowler-Williams each conducted a "focus probe"[2] in Delauder's department. Barnett's probe was conducted at the end of 1993, while Fowler-Williams's probe was conducted in March of 1994. During both probes, a majority of Delauder's subordinates complained that they had serious problems with Delauder's management style. Specifically, Delauder's employees made the follow complaints to Fowler-Williams: Bill Lowen felt that Delauder was unfair in not allowing him to work flexible shifts; Terri McNabb complained that the work environment was stressful and that Delauder failed to treat the employees fairly or with respect; James Davidson noted that Delauder was unprofessional and that he thought people were afraid of Delauder because he felt she would retaliate against them if they complained; Karla Knuth complained that Delauder did not communicate well with her subordinates and did not listen to them; and Bob DeBoy stated that the working conditions in the department were miserable and that employees spoke unfavorably about Delauder in her absence. Questions about the work environment in the department yielded responses such as "[c]hange management ... main problem no trust, don't speak, not friendly.... Communication difficult," and "[g]et rid of Becky, Undermining and not using other employees."
 
 
 6
 After the conclusion of the probes, both Barnett and Fowler-Williams met with Dunn and Biggs to discuss the feedback received. The probes did not establish that Delauder had discriminated against African-American employees; rather the responses elicited from the employees implied that Delauder's subordinates, white and African-American alike, were unhappy with her management style and felt that Delauder failed to treat them with respect.
 
 
 7
 As a result of the information gathered from the investigation, Fowler-Williams decided to institute diversity training in Delauder's department. Fowler-Williams advised Dunn and Biggs to send Delauder to effective communication workshops and supervisory training seminars provided by Lincoln. Fowler-Williams also suggested that Dunn have Delauder participate in an internal employee development and career planning program that assisted employees in assessing their weaknesses. Dunn and Biggs failed to implement any of Fowler-Williams's recommendations. Dunn advised Fowler-Williams that he was working with Delauder independently to improve her management skills.
 
 
 8
 Throughout 1995, Fowler-Williams continued to receive complaints about Delauder. The most frequent complainer was Shirley Ayers ("Ayers"), an African-American employee serving under Delauder's supervision. During the year, Fowler-Williams claims she spoke with Ayers on an average of three times each week regarding Delauder's treatment of Ayers. Fowler-Williams testified that Ayers was so upset that she came to her office in tears "numerous" times. On a number of occasions, Ayers even told Fowler-Williams that she was prepared to telephone her attorney and file a lawsuit against Lincoln because of Delauder's discriminatory treatment. On such occasions, Fowler-Williams asked Ayers to allow her and Barnett to "work through the problem" with Delauder. As a result of Ayers's threatened litigation, Fowler-Williams routinely approached Dunn and asked him to provide Delauder with additional training to improve the communication between Delauder and her subordinates. However, according to Fowler-Williams, Dunn failed to take any action to solve this problem. Ultimately, in May of 1995, Fowler-Williams met with Ayers and Dunn to discuss Ayers's complaints. Dunn agreed to transfer Ayers to another division so as to remove her from Delauder's day-to-day supervision. In her new assignment, Ayers reported to Tammy Harper ("Harper"), who in turn reported to Delauder. Shortly after Ayers's transfer, Harper complained to Fowler-Williams that Delauder continued to harass Ayers by constantly telephoning "out to the west area" to find out where Ayers was and what she was doing.
 
 
 9
 In mid-1995, Ayers complained to Fowler-Williams that Delauder had denied her a pay raise for which she was eligible. Ayers felt the denial was in response to Ayers's frequent complaints about Delauder to HR and AAD. Delauder's denial of Ayers's pay raise was ultimately reversed by Lincoln management. At the same time, Ivory Dickey ("Dickey"), one of Delauder's African-American subordinates, complained that Delauder had discriminated against him by giving a higher pay raise to a white co-worker who performed the same job, had the same amount of seniority, and had an inferior work performance evaluation. Dickey complained a few months later when a white co-worker in a similar circumstance was promoted out of turn. At this time, Dickey complained not because he failed to get the position, but because Delauder had made a racial comment during her announcement of the promotion. Apparently, when Delauder informed Dickey of the selection, she told him that "this isn't a black and white issue, but we can make it into one if you want to."
 
 
 10
 Finally, in late 1995, after several more meetings with Barnett and Fowler-Williams, Dunn directed Biggs to create an "action plan" for correcting the problems between Delauder and her subordinates. Although Biggs prepared the action plan and completed several of the actions set forth in it, she failed to complete the plan.
 
 
 11
 In April of 1996, Harper complained to Fowler-Williams that Delauder had denied her a pay raise for which she was eligible. Delauder also told Harper that because she had told Fowler-Williams that Delauder was continuing to harass Ayers, it "would be a long time" before Delauder would trust Harper again. Harper complained that her salary increase had been denied in retaliation for her support for Ayers. Fowler-Williams expressed her concern that such a retaliation could put Lincoln at risk of a lawsuit. Dunn ultimately reversed Delauder's decision and gave Harper the raise.
 
 C. The Decision to Terminate Delauder
 
 12
 Thoroughly frustrated with Dunn and Biggs's lack of attention to their concerns, several of Delauder's subordinates, including Ayers and Harper, began making their complaints directly to Mike Wright ("Wright"), Dunn's supervisor and Lincoln's Senior Vice President and Chief Information Officer. Wright later met with Fowler-Williams, Barnett, and Dunn to discuss the problems and the history of complaints in Delauder's department.
 
 
 13
 On June 5, 1996, Wright also met with Delauder personally to discuss the various complaints about her. During this meeting, Delauder said nothing that assured Wright that the complaints were not justified. In fact, Delauder's conduct and attitude during the meeting, according to Wright, convinced him that Delauder's subordinates had a legitimate concern. Wright made clear that he did not determine that Delauder had discriminated against her African-American employees, but was satisfied that there was a serious morale problem in Delauder's department. Wright ordered Dunn to terminate Delauder from her supervisory position and give her 90 days to apply for non-supervisory employment within Lincoln. After receiving notice that she had been terminated from her leadership position, Delauder wrote a memo to Mike Walker ("Walker"), Director of HR at Lincoln, appealing Wright's decision. In her memo, Delauder specifically stated: "I feel that I am losing my job at Lincoln because, in my opinion, Cynthia Barnett has incorrectly determined that I am a racist." Walker then met with Delauder and various members of his HR staff, and determined that there was no evidence that Delauder had been discriminated against because of her race or gender due to the fact that Wright had not determined that Delauder had discriminated against her African-American employees. Delauder subsequently filed a complaint with Fowler-Williams stating: "I believe that I have been discriminated against and treated unfairly on the basis of my race and/or sex...." Fowler-Williams responded that she had reviewed the decision to terminate Delauder and agreed with Walker's determination that there was no evidence that Delauder had been terminated because of her race or gender.
 
 
 14
 D. Delauder Attempts to Post for a New Position
 
 
 15
 After relieving Delauder of her supervisory duties, Wright specifically instructed the new HR consultant, Delanoy, to "follow-up" and provide Delauder with any assistance that she might need in applying for a new position. Delanoy offered to assist Delauder in preparing a resume and practicing for interviews. Delanoy contacted Lincoln's employment office in an attempt to uncover other available positions. Finally, Delanoy also told Delauder that she was free to "post" for any employment opportunity within Lincoln that she was interested in, but that due to the fact that Delauder had been previously terminated from a supervisory position, she should not post for supervisory employment. During the 90-day period, Delauder only posted for two job openings. One position was Telecommunications Coordinator within Lincoln's Information Services Department. Delauder was one of thirteen applicants for the position. Delauder was evaluated and given a "score," gaging her abilities to complete the tasks required in the position, of 2.7 out of 4.0. Seven other candidates had a higher score than Delauder, one candidate had the same score, while four had lower scores. The position's hiring coordinator rejected Delauder, explaining that she "does not have the telecommunication technical skills to fill the position." Delauder also applied for the position of Records Management Workleader, a supervisory position. Because the position was supervisory, the hiring manager sought HR's input and recommendation concerning Delauder's qualifications. HR failed to give Delauder a positive or negative recommendation. Later, when the hiring manager pressed HR, Delanoy told the hiring manager that Delauder had been "relieved of her managerial duties" in her previous position, and that HR could not support her because of her problems in managing the Mail and Transportation department. Thus, the decision was made to not interview Delauder for this position. Because there were no other openings at Lincoln, Delauder was discharged at the end of the 90-day period.
 
 E. Lincoln Disciplines Biggs
 
 16
 At the same time that Wright ordered that Delauder be terminated from her supervisory duties, he suggested to Dunn that he take early retirement and Dunn complied. Wright also asked Dunn to issue Biggs a verbal warning for her failure to follow through on the action plan and for her failure to properly address the problems in Delauder's department. On the advice of Delanoy, Wright instructed Dunn to create a written documentation of the verbal warning for Biggs to sign. Lincoln had used the documentation procedure in the past to correct employee difficulties. The written documentation of the warning given to Biggs was intended, according to Lincoln, to verify that the warning was actually given, and was not intended to have any additional consequences on Biggs's job. Biggs appealed the verbal warning to Walker, the director of HR, on July 16, 1996. Biggs also contacted Fowler-Williams and stated that the warning was the product of discrimination and retaliation, but failed to assert any facts to support her claims. Walker met with Barnett, Delanoy, and Fowler-Williams and discussed the appropriateness of the verbal warning. The group determined that there was no evidence that Biggs had been discriminated against, and that the issuance of the warning was suitable. Fowler-Williams informed Biggs that she had reviewed the decision to issue the warning and agreed with it, and furthermore that she had determined that the decision was not based on Biggs's race or sex. Shortly thereafter, Biggs filed a charge of discrimination with the Equal Employment Opportunity Commission.
 
 
 17
 In the meantime, Wright called together several of Dunn's subordinates and asked for suggestions on how to improve the operation of F & S. John Campbell ("Campbell"), Dunn's interim replacement, suggested that the Installation Services Unit, Biggs's sole remaining area of responsibility, be transferred to his control to promote efficiency. Wright agreed, and transferred jurisdiction over the installation Services Unit to Campbell. Campbell and Paul Johnston, the Director of Graphics and Purchasing, then suggested that Wright "job eliminate"[3] Biggs. Wright refused, and informed Biggs on August 2, 1996, that although her position was eliminated, he was not going to eliminate her job. Wright instructed Allen Warren ("Warren"), the Director of Print and Distribution, to find a position for Biggs. On August 26, 1996, Lincoln's HR department sent Biggs a formal notice of the job reassignment to Print and Distribution and informed her that her title, level, merit review date, and compensation rate would remain unchanged. HR notified Biggs that her duties in this new position had yet to be defined, but if she did not believe that the new position was a good match for her skills and interests, she would be free to enter Lincoln's Implacement Program to locate a new position. Initially, Warren put Biggs in charge of handling mailings, a position that required Biggs to supervise temporary employees. Biggs objected, stating that on days when there were no temporary employees in her department, she had the responsibility of handling mailings herself, which meant she had to stuff envelopes. As a result of the complaint, Wright asked Warren to assign Biggs more meaningful tasks. Warren asked Biggs to organize Lincoln's credit card purchasing system and coordinate the movement of several different departments into a new facility.
 
 
 18
 F. Delauder and Biggs File Suit Against Lincoln
 
 
 19
 Delauder filed suit against Lincoln on September 10, 1996, alleging that Lincoln discriminated against her on the basis of her race and sex and that Lincoln retaliated against her for her complaints of racial and sexual discrimination when it terminated her from her position as supervisor and refused to interview her for a different position. Lincoln filed a summary judgment motion on Delauder's complaint which the district court granted on August 28, 1997. Similarly, on September 10, 1996, Biggs filed suit against Lincoln, alleging that Lincoln discriminated against her on the basis of her race and sex and that Lincoln retaliated against her for her complaints of racial and sexual discrimination by verbally reprimanding her and reassigning her to a new position. After Biggs filed an amended complaint, Lincoln filed a motion for summary judgment, and on August 1, 1997, the district court granted the motion. Plaintiffs Biggs and Delauder appeal.
 
 DISCUSSION
 A. Standard of Review
 
 20
 On appeal, this Court affords the summary judgment decisions of a district court judge de novo review. See Allen v. TransAmerica Ins. Co., 115 F.3d 1305, 1309 (7 th Cir.1997). "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Johnson v. City of Fort Wayne, Ind., 91 F.3d 922, 930-31 (7 th Cir.1996). Evidence must be construed in the light most favorable to the non-moving party, and all legitimate inferences should be drawn in favor the non-moving party. See Dev v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1453 (7th Cir.1994). This Court's role should be to "determine whether there is any disputed issue of material fact that requires a trial." Id. (citation omitted).
 
 
 21
 A trial court is obligated to enter summary judgment against a party who, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering employment discrimination cases, "[t]his Court does not sit as a super-personnel department that reexamines an entity's business decisions." Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7 th Cir.1986), cert. denied, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987) (citation omitted).
 
 B. Delauder's Contentions
 
 22
 On appeal, Delauder, who is white, contends that she has adduced evidence that Lincoln's proffered reasons for terminating her from her position were pretextual and that Lincoln's proffered reason for not interviewing her for a new position was pretextual, thus precluding summary judgment. The trial court rejected Delauder's contentions and granted Lincoln's motion for summary judgment, ruling that Delauder had failed to raise an inference that Lincoln acted with pretext, or lied about its reasons for terminating her. Furthermore, the court concluded that Delauder failed to prove pretext with regard to Lincoln's failure to rehire her.
 
 
 23
 Generally, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by [Title VII]." Dev, 28 F.3d at 1457 (quoting 42 U.S.C. § 2000e-3(a)). Such discrimination, absent a showing of direct or circumstantial discrimination, is commonly referred to as "retaliation." Under this Court's holding in Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1313 (7 th Cir.1989), in order for a plaintiff in a Title VII discrimination case to establish a prima facie case of retaliation, she must demonstrate that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the employer's adverse action. Once a plaintiff makes the prima facie retaliation showing, under the burden-shifting test of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the accused bears the burden of demonstrating a legitimate, nondiscriminatory reason for discharging the employee.
 
 
 24
 If the parties do not dispute the fact that the employee presented a case of prima facie retaliation, and that the employer presented a legitimate nondiscriminatory reason for the employee's termination, "the McDonnell Douglas framework drops out of the picture leaving [the employee] with the ultimate burden of proving the discrimination by showing that [the employer] provided a pretextual reason for her termination." Tincher v. Wal-Mart Stores, Inc., 118 F.3d 1125, 1129 (7th Cir.1997) (citations and internal quotation omitted). "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." Wolf v. Buss (America), Inc., 77 F.3d 914, 919 (7th Cir.1996) (citation and internal quotation omitted). In determining pretext, this Court employs a three-part test. "A plaintiff can prove the incredibility of the employer's proffered reason for the termination, and thereby demonstrate pretext, by showing that the employer's proffered reasons are (1) factually baseless, (2) not the actual motivation for the discharge, or (3) insufficient to motivate the discharge." Tincher, 118 F.3d at 1130 (citation omitted) (emphasis added).
 
 
 25
 Although Lincoln concedes that Delauder has established a prima facie case of retaliation, Delauder contends that Lincoln's decision to terminate her from her supervisory duties was based on pretext. Specifically, Delauder, who is white, alleges that Lincoln terminated her because of her "disparate treatment of minorities." She also argues that a second reason offered by Lincoln, Delauder's perceived discrimination of minorities, is insufficient to warrant termination. Finally, Delauder alleges that Wright was less than truthful regarding the date he made the decision to discipline her and that he did not know who Delauder's supervisor was at the time of her termination, and therefore, a jury could infer that Wright is lying about his reasons for terminating Delauder.
 
 
 26
 Delauder initially contends that "one of the reasons proffered by Lincoln as a non-discriminatory reason for removing her [is] disparate treatment of minorities." Delauder's assertion that she was dismissed for disparate treatment of minorities was based on the fact that "disparate treatment of employees" was mentioned in a memorandum given to Delauder by Dunn upon her termination. However, Delauder mischaracterizes the memorandum, which lists a number of "issues" that had been discussed with Delauder during her meeting with Wright on June 5, 1996. These "issues" were:
 
 
 27
 -- Difficulty communicating or limited communications with your employees.
 
 
 28
 -- Perceived discrimination of minority employees by you.
 
 
 29
 -- Disparate treatment of employees (male/female, minority/non-minority).
 
 
 30
 -- Harassment of employees (based on race).
 
 
 31
 -- Lack of respect for your employees.
 
 
 32
 -- Your desire to control your employees vs. empower them.
 
 
 33
 Thus, according to the memorandum, "disparate treatment of employees" was one of the "issues" that had been discussed with Delauder. All of these "issues" arose from the various complaints that HR and AAD had been receiving from Delauder's subordinates since 1993. The memorandum further provides that these "issues" made it necessary for management to "evaluate [Delauder's] ability to continue in the function of [her] current role." The memo reveals that another meeting was held on June 6, 1996, between Delauder and Johnson to discuss "concerns" with Delauder's job performance. The "concerns" were:
 
 
 34
 -- concerns related to a negative team environment that has been in existence for quite some time
 
 
 35
 -- your inability to resolve or create a positive work place for your associates
 
 
 36
 -- management's loss of confidence in your leadership ability
 
 
 37
 The memorandum then states that "[a]s a result of these concerns you have been removed from your position as Supervisor ... effective immediately." (emphasis added). A fair reading of the memorandum reveals that although Lincoln discussed the various "issues" with Delauder, the decision to terminate her was based on her managerial shortcomings outlined in the "concerns" portion. Wright consistently testified that he did not base his decision to terminate Delauder on the allegation that Delauder had discriminated against her African-American employees. Furthermore, Delauder has failed to adduce any evidence to demonstrate that Wright read or even knew of the memo when making his decision to discharge Delauder.
 
 
 38
 Delauder's goes on to argue that "perceived discrimination of minority employees is also pretextual because it was not sufficient to warrant her removal." This contention is similarly based on the fact that "perceived discrimination of minority employees" is another "issue" mentioned in the termination memorandum prepared for Delauder. As discussed earlier, Delauder was dismissed as a result of the managerial incompetence addressed in the "concerns" portion of the termination memorandum. Wright terminated Delauder because, as far as he was concerned, she was the cause of the low morale problem in her department that had existed for a period of three years.
 
 
 39
 Finally, Delauder's third argument of pretext is based on her contention that Wright lied about his reasons for disciplining her. Delauder specifically claims that Wright lied concerning the date he made the decision to discipline her and that he lied when he claimed he did not know who Delauder's supervisor was at the time of her termination. Delauder argues that based upon these alleged falsehoods, a jury could infer that Wright was lying about why he disciplined Delauder, thereby demonstrating pretext. We note that Delauder's argument that Wright did not know the identity of Delauder's supervisor was not raised before the trial court and therefore is not properly before us and is thus waived on appeal. See Edward E. Gillen Co. v. City of Lake Forest, 3 F.3d 192, 196 (7 th Cir.1993). "Having forsaken the opportunity to articulate that argument in its memorandum [opposing summary judgment], [plaintiff] waived it...." Id. Delauder's contention that Wright lied concerning the date he made the decision to terminate her is similarly problematic. Wright testified that he did not decide to discipline Delauder until after he met with her personally on June 5, 1996. Delauder, relying on a memorandum prepared by Barnett, claims that Wright instructed Dunn to "put together a Formal Written Warning doc. for [Delauder]" on May 7, 1996. Thus, Delauder contends that since this memorandum conflicts with Wright's testimony, she is entitled to the inference that Wright was lying concerning his reasons for terminating Delauder. Delauder's contention is without merit for a number of reasons. Initially, we point out that Barnett prepared the memorandum, not Wright, and Delauder somehow seems to imply that Wright should be responsible for a memorandum he did not write. Second, there is no proof in the record that Wright had any knowledge of the memo's existence. Wright cannot be accountable for the content of a memorandum which the record fails to establish he assisted in the preparation of or read. Also, the memorandum does not reflect that Wright instructed Dunn to discharge Delauder from her position or issue Delauder a written warning prior to June 5; it merely recites that Wright instructed Dunn to prepare a written warning prior to June 5. As noted in the district court opinion, it does not necessarily follow that Wright had decided to terminate Delauder prior to June 5. In our opinion, Delauder has failed to present evidence sufficient to demonstrate that Wright was guilty of stating a falsehood. She likewise has failed to demonstrate that Lincoln acted with pretext in deciding to terminate her from her supervisory position.
 
 
 40
 Delauder also claims that she has presented evidence that Lincoln acted with pretext in refusing to rehire her. As discussed earlier, to demonstrate that pretext exists, an employee must establish that the employer's reasons for its actions were (1) baseless in fact, (2) not the actual motivation for the discharge, or (3) insufficient to motivate the discharge. See Tincher, 118 F.3d at 1130.
 
 
 41
 In our case, Delauder was given a 90-day grace period to attempt to locate a new position within Lincoln and was offered assistance from the company in her job hunt. Delauder was also advised that she was free to post for any position within Lincoln that she was interested in but that due to her shortcomings in managerial skills, she should not post for supervisory employment. During the 90-day period, Delauder posted for only two positions, one of which received applicants more qualified than Delauder. The other position was a supervisory position, and Delanoy told the hiring manager responsible for filling this position that Delauder had been "relieved of her managerial duties," and that HR would be unable to support her application for a supervisory position. Based on this information, the decision was made not to interview Delauder. Delauder contends that Lincoln's basis for not interviewing her was retaliation. Lincoln asserts that the reason Delauder was not interviewed was because she received a negative endorsement from Lincoln's HR department.
 
 
 42
 We have been unable to discover any evidence in the record to support the notion that the negative endorsement from Lincoln's HR department was pretextual. In fact, Lincoln argues that it is the company's standard procedure to refuse to give a positive endorsement for an employee applying to a supervisory position when that employee has previously had difficulties in management and we do not think this is unusual. The mountain of complaints and subsequent termination of Delauder from her management position were well-documented as the actual motivation for the company's refusal to grant a positive endorsement for Delauder and were a completely sufficient basis for Lincoln's refusal to rehire her. Delauder has failed to demonstrate an inference that the reasons used by Lincoln in refusing to rehire her were pretextual and has thus failed to demonstrate retaliation.
 
 C. Biggs's Contentions
 
 43
 On appeal, Biggs contends that the trial court committed reversible error in granting the defendant's summary judgment motion. In her complaint, Biggs alleged that Lincoln discriminated against her on the basis of her race and sex and that Lincoln retaliated against her by verbally reprimanding her and removing her from her supervisory position and transferring her into another department. The trial court, in granting summary judgment, disagreed, and ruled that Biggs had failed to demonstrate that she had been subjected to disparate treatment or retaliation.
 
 
 44
 On appeal, Biggs attempts to raise an inference of discrimination for her disparate treatment and retaliation theories under the familiar McDonnell Douglas burden-shifting framework. As discussed in our analysis of Delauder's claims, Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against any of his employees because the employee opposes any of the employer's practices that are unlawful under Title VII. See 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation under Title VII, the employee must demonstrate that she engaged in statutorily protected expression, she suffered an adverse action by her employer, and there was a causal link between the protected expression and the adverse action. See Holland, 883 F.2d at 1313. Similarly, a prima facie claim of disparate treatment is satisfied where a party can establish that she suffered an adverse employment action and that similarly situated employees were treated more favorably. See Rand v. CF Indus., Inc., 42 F.3d 1139, 1144 (7 th Cir.1994). The common thread in establishing a claim of either retaliation or disparate treatment, therefore, is the demonstration that an employer caused the employee to suffer an "adverse employment action."
 
 
 45
 In the case under consideration, Biggs contends that two of Lincoln's actions constituted "adverse employment actions" under the rule in Holland: the verbal warning she received and her job reassignment to the Print and Distribution center. This Court has previously held that a person is not a victim of unlawful discrimination unless she has suffered a tangible harm. Thus, we held in Rabinovitz v. Pean, 89 F.3d 482, 488 (7 th Cir.1996), that an alleged adverse employment action must be "material."
 
 
 46
 [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.
 
 
 47
 Cradv v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7 th Cir.1993) (citation omitted). Although "[a]dverse employment action has been defined quite broadly in this circuit ... not everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State University, 89 F.3d 437, 441 (7 th Cir.1996). In Smart, a employee sued Ball State University for allegedly retaliating against her in response to sex discrimination charges she filed with the Equal Employment Opportunity Commission. See id. at 438. Specifically, the plaintiff argued that her negative performance reviews constituted an "adverse employment action." See id. at 442. We held that the since the plaintiff's evaluations "were characteristic of a structured training program" and "facially neutral tools designed to identify strengths and weaknesses in order to further the learning process," they could not be considered "adverse" pursuant to Title VII. Id. Furthermore, "minor and trivial employment actions ... and employment actions that merely inconvenience the employee ... are not actionable." Daulo v. Commonwealth Edison, 938 F.Supp. 1388, 1397 (N.D.Ill.1996).
 
 
 48
 In our case, Biggs contends that the verbal warning was a materially adverse employment action. After Delauder was terminated, Wright directed Dunn to issue Biggs a warning for her failure to properly address the problems in Delauder's department. Biggs was given the warning for her inability to correct Delauder's difficulties in managing the Mail and Transportation Department. Wright then instructed Dunn, as discussed earlier, to prepare a written documentation of the verbal warning for Biggs to sign.[4] In making her claims of discrimination and retaliation, Biggs contends that the warning amounted to an adverse action. However, as we discussed in Smart, a negative performance evaluation does not qualify as an adverse employment action, even when the negative evaluation results in the loss of a monetary bonus. See 89 F.3d at 442. In our view, there is no practical difference between the verbal reprimand in Biggs's case and the negative evaluation at issue in Smart. Both are standard business and industry forms of evaluation that serve as "tools designed to identify strengths and weaknesses in order to further the learning process." Id.
 
 
 49
 Soon after Biggs was given her verbal warning, Biggs's supervisor, Wright, called together Lincoln's supervisory staff for suggestions on improving the efficiency of Lincoln's operations, and at this time, Biggs's duties were limited in an effort to improve company efficiency. Biggs also contends that the job reassignment was an adverse employment action. Apart from the fact that the transfer of Biggs's duties was apparently unrelated to her difficulties in properly managing Delauder, this Court has made it clear that a lateral job transfer is an adverse job action only when there are facts sufficient to transform a lateral transfer into a demotion. See Crady, 993 F.2d at 136. It is interesting to note that Biggs suffered no reduction in title, level, or compensation, and has failed to adduce any evidence that supports the notion that her new duties were a diminishment from her duties prior to the reassignment. Furthermore, Biggs was given an opportunity to post for the next available supervisory position at Lincoln. Thus, her position at the Print and Distribution Department, where she enjoyed the same pay and benefits as her previous position, can be viewed as temporary, and the courts have long held that a temporary reduction in job duties is not an adverse job action. See Daulo, 938 F.Supp. at 1398.
 
 
 50
 Biggs has failed to demonstrate, under McDonnell Douglas, that she suffered an adverse employment action. Thus, she has failed to establish a prima facie case of retaliation or disparate treatment. Because she failed to meet her burden of proof, we need not consider Biggs's claims of pretext.
 
 
 51
 Similarly, Delauder failed to demonstrate that Lincoln acted with pretext in deciding to terminate her from her supervisory position and refusing to rehire her.
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 To ease the disposition of this matter, these two cases have been consolidated. Both arise out of a related factual situation, and concern similar contentions of employees of the defendant-appellee
 
 
 [2]
 A "focus probe" is a type of internal investigation device employed by Lincoln wherein a team questions affected employees about a perceived problem within the company
 
 
 [3]
 "Job eliminate" is a term that comes up frequently in this case and deals with an employment situation where after a reduction in duties, one's job is completely eliminated
 
 
 [4]
 The documentation of the warning was intended to verify that the warning was actually given and received by the employee, and was not intended to have any additional consequences on Biggs's job